COMMONWEALTH vs. MICHAEL A. MELLONE.

Suffolk.    March 16, 1987. — June 4, 1987.

Present: PERRETTA, KAPLAN, & SMITH, JJ.

*Assault with Intent to Murder. Mental Impairment. Intent. Self-Defense.
Practice, Criminal, New trial, Disclosure of defense witnesses.*

At the trial of an indictment for armed assault with intent to commit murder,
the judge did not err in excluding the proffered testimony of a psychiatrist,
where the mental impairment to which the witness proposed to testify
had, at the most, only a remote relation to the defendant's ability to
form a specific intent to kill. [279-282]

At the trial of an indictment for armed assault with intent to commit murder,
the proffered testimony of a psychiatrist was without probative value on
the questions whether the defendant believed he faced imminent peril
to be met with deadly force and whether he was reasonable in entertaining
that belief. [282]

Where, under a pretrial conference report in a criminal case, the defense
had agreed to furnish the prosecution with the names and statements of
any witnesses it intended to call and any psychiatric report in its posses-
sion, failure of the defense to furnish the statement of a proposed psy-
chiatric witness until the day before the commencement of trial would
have been sufficient to justify the judge in refusing the defendant's offer
of proof. [283]

The judge who heard a criminal defendant's motion for a new trial could
properly conclude that there was no substantial risk that a jury exposed
to the evidence submitted with the motion would reach a different result.
[283-284]

INDICTMENTS found and returned in the Superior Court De-
partment on December 11, 1984.

The cases were tried before *Robert A. Mulligan,* J., and a
motion for a new trial was heard by him.

*Robert H. Astor* for the defendant.

*Laura Callahan,* Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J. We affirm convictions of armed assault with intent to commit murder, and assault and battery by means of a dangerous weapon, and affirm also the trial judge's denial of a postjudgment motion for a new trial.[1]

We outline the Commonwealth's case in chief and the testimony for the defense. Then we have to consider a claim that the judge committed error in declining to permit a psychiatrist to give certain testimony.

Laurie Paesano, at a bar in Revere called "Jacob's Ladder" with two female companions — it was "ladies' night" — telephoned her boyfriend William Cameron (the eventual victim) at his place in East Boston and said she needed a ride home. Cameron responded quickly to the call and stayed at the bar with Paesano for ten to fifteen minutes until closing time at 1:30 A.M. (July 10, 1984). As Paesano and Cameron walked out the front door, they saw two men ahead of them; these were the defendant Michael Mellone and his friend Jeff Tanck. According to Paesano and Cameron, the defendant's walk was unsteady through drink. In attempting to pass by the defendant, Paesano bumped into him; she said, "Excuse me." The defendant spoke indistinctly and then called Laurie a "fucking slut." Paesano said, "Excuse me, what did you say," and she and the defendant moved toward each other. Cameron stepped between the two. With Paesano and Tanck standing by, the defendant and Cameron did some mutual pushing. Suddenly Cameron felt a tingling in his right forearm. Looking there he saw a "large flap" of skin with exposed tendons; he had suffered a deep cut. Realizing that he had been stabbed, Cameron said, "What are you, crazy?," and started to back to the entrance of the bar. At the same time the defendant lunged and struck Cameron with a knife in the chest and again he attacked, and opened a wound on the right side of Cameron's face. Cameron managed to get inside the bar. He was in serious

---

[1] The defendant was sentenced to four to ten years' imprisonment at M.C.I., Cedar Junction, on each charge, the sentences to run concurrently. His motion to revise and revoke, seeking a reduction of sentence, was denied by order of the trial judge. This order is not under appeal.

condition, hovering near unconsciousness. He had not been carrying a weapon of any kind.[2]

On the outside, Paesano was shouting and swinging her large (fifteen inch wide) pocketbook at the defendant, striking him in the face. He retreated and promptly left the area with Tanck.

By about 2:00 A.M. the two men were a mile and a half or so from Jacob's Ladder at a public phone booth close by a fire station[3] making some phone calls, one by the defendant to his wife.[4] A fire lieutenant, Eugene Doherty, had them in view and hearing from the firehouse. They were laughing and yelling. Doherty heard the defendant say, boisterously, "I cut him. I cut him good," this accompanied with a stabbing gesture. The defendant was carrying a bloodstained shirt or sweater. Doherty knew that a call had come in about a medical emergency at Jacob's Ladder to which another fire station had responded. Through his dispatcher he learned more about the episode and, believing the pair at the phone booth might have been involved, he asked the dispatcher to call the police.

Revere police officer Michael Casoli arrived in a few minutes, quickly took in the scene, and called for information about the affair at Jacob's Ladder. Thinking the two men likely were the actor in the fracas and his companion, Casoli led them into the firehouse. Paesano was brought from Jacob's Ladder and instantly and positively identified the defendant — "He's the one." Doherty testified that the defendant may have been stumbling at the time of arrest, but that his speech was not slurred and he was not obviously or grossly intoxicated. Casoli testified that the defendant appeared to be "feeling pretty good" but was not overcome by drink.

[2] Cameron suffered scars on his right arm, chest, and face, and permanent loss of sensation in the fourth and fifth fingers of his right hand.

[3] The defendant testified he did not remember how he and Tanck reached the firehouse but that Tanck told him later they had gotten a lift. Tanck did not testify at trial.

[4] The wife testified to the phone call and said the defendant was not coherent. She spoke also to Tanck.

Revere officer Adam Dispasquale, searching the area around the entrance to the bar later that morning, found in shrubbery a folding knife, closed, with a four to five inch blade. The handle was covered with blood somewhat diluted by fallen rain. The defendant conceded that the knife was his.

The foregoing Commonwealth's case was testified to by Cameron, Paesano, and the two officers. For the defense, there was testimony by the defendant and his wife. The defendant's account ran thus. At 2:00 P.M., July 9, he left his job as an auto mechanic and went home to Medford. He worked around the house (using his knife), and had an early supper, consuming meanwhile three large (sixteen ounce rather than the usual twelve ounce) cans of beer. About 5:30 P.M., two male friends showed up and all split a liter (a third larger than an ordinary commercial bottle) of homemade wine. Then they went fishing (the defendant carrying his knife). The three drank two more liters of wine while fishing; then they went to a restaurant and later to a friend's house, with the defendant consuming at these places total of a glass and half of beer and three glasses of wine. At 11:00 P.M. the defendant returned home and drank two large cans of beer. Around 11:30 P.M. he left for Jacob's Ladder with Tanck (his knife in his pants pocket). The defendant had a can of beer during the drive to the bar, and at the bar he drank beer and two "black Russians" (vodka and kahlua). The defendant remembered leaving the bar at closing time but his memory thereafter was sketchy when it was not blank. He said he recalled being punched in the face and knocked down just after leaving the bar.[5] Further, he recalled someone yelling, "Look out. He's got a straight razor," and, later, a woman screaming at him at the firehouse. He said he recalled nothing more of the events of the evening.

The defendant testified, as background, that during the summer of 1984 he was drinking heavily, often with his male friends. It was a circumstance leading to arguments with his

---

[5] Medical records indicated that the defendant suffered that night a fracture of the nose and abrasions of his back. The nose injury could be attributed to his being punched or being hit with Paesano's pocketbook.

wife and to two separations from her, that he behaved as if single, not like a married man with a wife and child. He was charged with a number of offenses during the period and on one offense he received probation on condition that he get psychiatric treatment and attend Alcoholics Anonymous. His relations with his wife, he said, were improved at the time of trial. The defendant's wife testified to the difficulties in 1984, to the improved condition of the marriage, and to the defendant's general rehabilitation.

Cross-examination of the defendant was severe and sought to show that the defendant's recall was selective, and his behavior — including his disposal of the knife, his flight, and his conduct at the firehouse — conscious or calculated, rather than lost in the haze of alcohol that he strove to picture through exaggeration of his drinking.

On the whole record a jury could readily find that the defendant was guilty beyond a reasonable doubt of the crimes charged. He does not argue to the contrary.[6] Rather he submits that upon an offer of proof consisting, in substance, of a letter by Dr. Daniel M. Weiss to defense counsel, indicating what this psychiatrist would say if called, the judge should have allowed the testimony. This related, supposedly, to the issues of (a) the specific intent to kill required for conviction of the crime of armed assault with intent to murder, and (b) self-defense.

1(a). At the time of trial (July, 1985), it was already indicated, although it was not quite clear, that cogent psychiatric opinion might be received as relevant on the matter of the specific intent. It had been held under a charge of first degree murder that proof might be received of intoxication, consumption of drugs, or mental impairment that had gone so far at the time of the criminal event as to negate a defendant's capacity for deliberate premeditation.[7] See *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615, 617-618 (1949); *Commonwealth* v.

---

[6] He does not question the judge's denial of his motion for a required finding at the close of the Commonwealth's case.

[7] In this and later statements, it is of course to be understood that the burden remains on the Commonwealth to establish the defendant's capacity for deliberate premeditation, etc.

*Gould,* 380 Mass. 672, 680-683 (1980). In *Commonwealth* v. *Henson,* 394 Mass. 584, 592-594 (April 18, 1985), a case of armed assault with intent to murder, the court stated that the specific intent to kill, an element of the crime, was so close to deliberate premeditation in first degree murder that here, too, a jury could be asked to consider whether intoxication at the time was of such severity as to disable a defendant from forming the intent. When the present case was tried, three months after *Henson,* one could surmise that disabling mental impairment might serve as well as disabling intoxication; and in *Commonwealth* v. *Grey,* 399 Mass. 469, 471-472 (March 19, 1987), the court made a near approach to the precise proposition in holding that grievous mental impairment could prevent a person from conceiving a specific intent to kill which can form the basis for a finding of the malice that must underlie second degree murder.[8]

Acknowledging the *Grey* decision and its implications, we hold the judge's exclusion of Dr. Weiss's intended testimony was correct because such mental impairment as the witness proposed to speak of had no, or at most only a remote relation to the question of the defendant's ability to form an intent to kill.[9]

In his letter dated July 2, 1985, to counsel, Dr. Weiss reported his impression of an interview with the defendant on June 28. To mention the more salient points: The defendant, a high school graduate, "appears to me" to have an I.Q. slightly below normal[10] but to be intelligent enough to work as an auto

---

[8] A concurring opinion suggested that the court was effectively making second degree murder a specific intent crime by equating the intent to kill that may prove malice, with the specific intent to kill required to convict of such a crime as assault with intent to murder. This might be thought to approach an adoption of a "diminished capacity" defense to murder.

[9] The judge in his instructions defined specific intent to kill and dealt with the possible bearing of intoxication; he did not single out the question of mental impairment because he had ruled negatively on the offer of proof. The defendant took no objection to these instructions.

[10] In a later affidavit (mentioned below), Dr. Weiss said he believed, without actual testing, that the defendants had an I.Q. of about 95, the average I.Q. being between 90 and 110.

body mechanic. His life was "ordinary" until June, 1984, when troubles with his wife peaked. This coincided with his increased drinking and some trying of cocaine. In these circumstances the defendant committed a round of offenses including those of July 10. In connection with a probationary sentence he was admitted to Lindemann Mental Health Center on August 17, 1984. Dr. Weiss had seen the Center's report (actually dated September 6, 1984, not produced as part of the this offer of proof)[11] which made a diagnosis of "bipolar disorder" or "manic depressive disorder" or "syndrome." The defendant was given lithium. He had since been taking medication, had attended A.A., had been restored with his wife, and had no further trouble. Dr. Weiss concluded (with no excess of clarity) as follows: "[W]ere it only for the drugs and alcohol, I would have to say that legally this man is and was responsible for his actions. However, when one adds the basic problem of manic depressive syndrome, which was undiagnosed and un-treated to the situation, with the drugs and alcohol, then the explosive situation can result. Basically, therefore, one would have to say that he was responsible, but the mitigating cir-cumstances of the undiagnosed mental condition would seem to cause one to say that this is a condition which would not have existed had he been aware of his mental problems."

Even giving credit to the Center's conclusion (as Dr. Weiss apparently did), there was little, if anything in Dr. Weiss's communication that threw light on the defendant's capacity to form the criminal intent. Rather the letter described the milieu of a crime of violence. Compare *United States* v. *Bennett,* 539 F.2d 45, 52-53 (10th Cir. 1976), distinguishing an explanation of a defendant's committing a violent crime from an analysis of his capacity to form a given intent. That the defendant was a disturbed person in the summer of 1984 was entirely compat-ible with his being able to conceive a purpose to do serious injury to another (indeed, it makes very plausible that he did in fact do so).

---

[11] The date and some detail of the report appear in Dr. Weiss's affidavit (mentioned below).

We need hardly refer here to the judge's measure of discretion on a question of receiving an expert opinion. See *Commonwealth* v. *Francis,* 390 Mass. 89, 98 (1983); *Commonwealth* v. *Gregory,* 17 Mass. App. Ct. 651, 654 (1984).

(b) Coming to Dr. Weiss's letter in relation to the issue of self-defense (an issue which figured narrowly in the case because of the defendant's supposed belief that he was being threatened with a razor), we have to deal with a preliminary question. The defendant urged on the judge that he should instruct the jury on a wholly "subjective" view of self-defense, i.e., that all that counted was whether the defendant believed he faced imminent peril to be met with deadly force. For this proposition the defendant cited the cases of *Commonwealth* v. *Burbank,* 388 Mass. 789 (1983), and *Commonwealth* v. *Rodriguez,* 17 Mass. App. Ct. 547 (1984), neither of which supports him.[12] The judge, over objection, charged according to tradition and precedent in the Commonwealth, combining "subjective" and "objective" elements: the actor must have the belief, and also be reasonable in entertaining it. See *Commonwealth* v. *Crowley,* 165 Mass. 569, 570 (1896); *Commonwealth* v. *Kendrick,* 351 Mass. 203, 211 (1966); *Commonwealth* v. *Harrington,* 379 Mass. 446, 450 (1980); *Commonwealth* v. *Burbank,* 388 Mass. at 794.

Whatever may be held about the propriety of admitting proof of mental impairment as bearing on a defendant's belief that he was in peril, here Dr. Weiss's letter had as little to contribute to the question whether the defendant could (or did) have the requisite belief as it had to offer on the question of intent to kill. It had even less bearing on the question of reasonableness, where a negative answer would itself be decisive against the claim of self-defense. There is no occasion in this case to discuss the difficulties in defining with scientific exactness the basis from which "reasonableness" is to be viewed.[13]

---

[12] These cases deal with matters known by the actor that might affect his belief. They do not challenge the customary subjective/objective formulation of self-defense or consider any relevance of psychiatric opinion.

[13] The difficulties are referred to in A.L.I., Model Penal Code and Commentaries § 3.04, comment 2 (1985). They may be perceived in the recent

2. The defense was dilatory in coming forward with Dr. Weiss's opinion and the judge would have been justified in · refusing the offer of proof on that ground alone. Under a pretrial conference report of January, 1985, the defense agreed to furnish the names and statements of witnesses intended to be called and any psychiatric report in its possession. When defense counsel in her opening remarks to the jury said they would hear from Dr. Weiss, the prosecutor protested at the sidebar that Dr. Weiss had not been named as a witness. Counsel replied (inadequately, we think) that, at a previous court session before a different judge, she said she had sent the defendant to see Dr. Weiss. Although Dr. Weiss's letter was dated July 2, 1985, it was not handed to the prosecution until July 29, the day before the commencement of trial. This left the Commonwealth in a difficult position to respond to the proffered testimony, if it should call for response. See *Commonwealth* v. *Chappee,* 397 Mass. 508, 518-519 (1986). The obligation undertaken in the pretrial conference report is to be read as a duty, so far as may be feasible, to inform the adversary fairly and seasonally.[14]

3. The defendant applied in October, 1985, for a new trial now tendering an affidavit of Dr. Weiss dated August 28, 1985, about what he would have said if he had been called. In this statement the affiant tried to "swear up" to what he took to be the necessary legal criteria. There is no indication that the affidavit has any more solid basis or pertinence than the letter. The judge had a broad discretion to deny a new trial; he could hold that there was no ground for a contention "that justice may not have been done," see Mass.R.Crim.P. 30(b), 378 Mass. 901 (1979); *Commonwealth* v. *Stewart,* 383 Mass. 253, 257-258 (1981), and that any material offered on the motion failed to "create[] a substantial risk that a jury exposed

decision of the New York Court of Appeals in *People* v. *Goetz,* 68 N.Y.2d 96 (1986). See also the concurring opinion in *Commonwealth* v. *Starling,* 382 Mass. 423, 430-431 (1981).

[14] The judge advised the jury to draw no inference from the non-appearance of Dr. Weiss as a witness after he was named in the opening statement for the defense.

to that evidence would have reached a different conclusion." *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 655 (1980).

*Judgments affirmed.*

*Order denying new trial affirmed.*