COMMONWEALTH *VS.* DEBORAH CONAGHAN.

No. 98-P-315.

Worcester. April 13, 1999. - December 3, 1999.

Present: LAURENCE, DREBEN, & GILLERMAN, JJ.

Further appellate review granted, 430 Mass. 1115 (2000).

*Practice, Criminal,* Postconviction relief, Plea, Judicial discretion, Affidavit. *Evidence,* Guilty plea. *Homicide. Battered Woman Syndrome. Mental Impairment.*

In a proceeding on a criminal defendant's motion to withdraw a guilty plea, the judge erred in concluding that he had no discretion to consider materials submitted by the defendant that were not in affidavit form [308-310]; however, this court undertook to examine all the materials submitted in considering the defendant's appeal [310].

Materials submitted by a criminal defendant in support of a motion to withdraw a guilty plea to an indictment for manslaughter did not credibly demonstrate that another person was solely responsible for the victim's death. [310-311]

An affidavit in support of a criminal defendant's motion to withdraw a guilty plea to a manslaughter indictment did not state facts sufficient to warrant a conclusion that, at the time of the crime, she suffered from battered woman's syndrome and therefore lacked the mental state necessary to support her conviction, and, where she failed to raise a substantial issue, she was not entitled to a hearing on her claim. [311-313]

The materials submitted in support of a criminal defendant's motion to withdraw her plea did not demonstrate that her plea of guilty to a manslaughter indictment was involuntary and, where no substantial issue as to voluntariness was raised, the judge properly declined to hold an evidentiary hearing on the motion. [313-316] DREBEN, J., dissenting, was of the opinion that the defendant was entitled to an evidentiary hearing.

A criminal defendant serving a sentence after pleading guilty to the manslaughter of her child was not entitled to a postconviction examination by a court-appointed psychiatrist pursuant to G. L. c. 123, § 15(*a*), in connection with her motion to withdraw her plea, where nothing in the materials submitted in support of the motion demonstrated that her asserted suffering from battered woman's syndrome was a mental disease or defect that prevented her from understanding the wrongfulness of her conduct or from controlling her behavior. [316-319]

INDICTMENT found and returned in the Superior Court Department on April 17, 1992.

A motion to withdraw a guilty plea, filed on April 29, 1997, and a motion for a psychiatric examination, filed on December 2, 1997, were heard by *Herbert F. Travers, Jr.,* J.

*Dana Alan Curhan* for the defendant.

*Anne S. Manzello,* Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. On September 1, 1992, the defendant, Deborah Conaghan, pleaded guilty to the charge of manslaughter in connection with the death of her five year old son, Garrett. On April 29, 1997, approximately four and one-half years later, the defendant filed a motion in the Superior Court to withdraw her guilty plea. She subsequently filed a motion for a psychiatric examination on December 2, 1997, and a nonevidentiary hearing on the motion was held on December 16, 1997. The motion judge, who was not the trial judge, denied both motions on January 12, 1998.

The defendant claims that the judge erred in denying her motion to withdraw her guilty plea or, in the alternative, that he erred in failing to grant her an evidentiary hearing because she presented substantial evidence that (1) her former boyfriend inflicted the fatal injuries upon her son; (2) to the extent that she may have contributed to her son's death, she suffered from battered woman's syndrome and other psychological disorders and therefore lacked the state of mind necessary to support a conviction; and (3) her plea was the product of intimidation and coercion and therefore was not voluntary.

The defendant also argues that the motion judge erred in denying her motion for a psychiatric examination. While her claim for an independent psychiatric examination was specifically denied, the defendant contends that the judge failed to consider her alternate claim that she was entitled to be examined by a psychiatrist designated by the court.

1. *The plea hearing.* At the plea hearing, the Commonwealth contended that the following facts would be proven if the defendant's case proceeded to trial.

The defendant is divorced from Garrett's father. During the summer of 1991, Garrett stayed with his father, who was living in New Jersey. Garrett returned to the defendant's residence at the end of August. At that time, the defendant was living with her boyfriend, Paul Haynes (Haynes).

Garrett entered the first grade in September, 1991. On October

1, 1991, Garrett's teacher noticed bruises on his hands and sent him to the school nurse. The nurse noticed additional bruising on his right forearm and on his temple. The nurse filed a report with the Department of Social Services (DSS), and an investigation was commenced. When questioned by a DSS investigator, the defendant stated that the bruising occurred when Garrett fell against a car as he was riding his bicycle.

On October 3, 1991, Garrett was examined by a pediatrician who determined that the injuries were not accidental. However, when the doctor spoke to the defendant about the cause of Garrett's injuries, she provided the same explanation that she had given the DSS investigator, i.e., that Garrett had fallen against a car while riding his bike.

On October 12, 1991, at approximately 1:30 P.M., the defendant brought Garrett into the emergency room at St. Vincent Hospital. He was unconscious, with no heartbeat or other vital signs. The defendant told the emergency personnel that Garrett had slipped in the bathroom, fallen backward, and struck the back of his head. She stated that he then had a seizure and lost consciousness. His body went limp, and his lips changed color. It was at that time that the defendant decided to take Garrett to the hospital. He died at approximately 3:00 P.M. that afternoon.

Police officers went to the defendant's house later that day to question her. She told the officers that earlier in the day, she had given Garrett lunch, after which he had rushed into the bathroom. He vomited into the sink, and the defendant helped him wash his face. Garrett then slipped on water that the defendant had spilt on the floor while she was washing his face. He fell back, hit his head on the floor, and went into a seizure. The defendant also told the police that Garrett's hands had been bruised when he ran into a car with his bicycle.

The next day, an autopsy was performed on Garrett's body. The autopsy revealed that he had suffered three subdural hematomas of varying age. One was consistent with having been sustained on the day that he died, one was sustained approximately fourteen days before that, and the third was older and could not be dated. It was determined that the cause of death was blunt trauma, and that the recent hematoma had aggravated his fourteen day old subdural hematoma, thereby causing his brain to swell, resulting in death.

On October 17, 1991, police officers again interviewed the

defendant. She initially gave them the same account that she had given five days earlier, but she changed her story when one of the officers said that he did not believe her.[1] The officers asked her a number of questions about events on the day that Garrett died, and she gave them a statement.

The defendant stated that on the day of Garrett's death, he vomited in the bathroom and, to punish him, the defendant took him into the kitchen. She told the police, "I pushed him with my right hand on his chest or head. Garrett would fall down. Then he got back up and I would push him again and Garrett would fall on the floor. This happened two or three times. Then he just fell on the floor and went into a seizure." In answer to additional questions the defendant said she had given him the same form of punishment four or five times previously. On those occasions, she said, "Garrett was disobeying or not listening to me so instead of hitting him I kept pushing him onto the floor. I pushed him two to three times and every time I pushed him he got up and I pushed him again." The use of this means of punishment had caused Garrett to develop a "lazy eye" and had also caused him to begin vomiting regularly.

The defendant also told the police that after she had knocked Garrett down several times on the day of his death, he went into a seizure. She took him into his bedroom to get him dressed. While in the bedroom, Garrett stopped breathing, and his lips turned blue. Asked to describe the seizure, the defendant said Garrett fainted, fell forward, hit the front of his head, and was shaking on the ground. After relating these facts to the police, the defendant signed her statement. The defendant acknowledged to the judge that her statement to the police was "true and accurate."

Earlier in the proceeding, the judge had probed the defendant's mind. He questioned her about her prior psychiatric treatment, asked whether she was on any medication, discussed the effects of her medication, asked whether she was under the influence of drugs or alcohol, and asked if she had had a period of psychiatric examination in connection with this case. All these questions were answered in the negative or otherwise to the satisfaction of the judge.

---

[1] The defendant was asked to tell the truth and was advised of her Miranda rights, which she waived at that time.

During the colloquy, the defendant stated that she was pleading guilty of her own free will. She replied, "No," when she was asked if anyone had threatened her or made any promises to her in order to get her to plead guilty. She also replied, "No," when the judge asked her if she was confused by anything he said and if she had any questions about the plea procedure. She acknowledged that throughout the proceedings against her she had been represented by a good lawyer who had worked in her best interest. The judge told the defendant the maximum sentence for manslaughter was twenty years in a State prison, and the defendant said she understood that.

Finally, the judge asked the defendant, "And may I understand that you are pleading guilty for but one reason, that being that you are, in fact, guilty, which is to say that you did do the things that [the prosecutor] told me you did?" The defendant answered, "Yes." The plea judge then concluded, "I find that the plea of guilty is freely, willingly, voluntarily and intelligently offered and it is accepted."

2. *Motion to withdraw the defendant's guilty plea.*

(a) *Standard of review.* A postconviction motion to withdraw a guilty plea is treated as a motion for a new trial. *Commonwealth v. DeMarco*, 387 Mass. 481, 482 (1982). See *Commonwealth v. Russin*, 420 Mass. 309, 315 (1995). "The judge is to apply the standard set out in rule 30 [Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979)] 'rigorously,' and may grant a motion to withdraw a guilty plea only if 'it appears that justice may not have been done.' " *Commonwealth v. Facella*, 42 Mass. App. Ct. 354, 355 (1996), quoting from *Commonwealth v. DeMarco*, 387 Mass. at 486-487. The motion is addressed to the sound discretion of the judge. *Commonwealth v. Correa*, 43 Mass. App. Ct. 714, 716 (1997). "Contrary to the defendant's contention, the judge properly exercised his discretion in concluding that [her] motion did not raise a 'substantial issue,' and that an evidentiary hearing was not required." *Commonwealth v. Facella, supra* at 355, citing *Commonwealth v. DeVincent*, 421 Mass. 64, 67, 69 (1995).

(b) *Consideration of the defendant's supplementary materials.* The defendant filed various documents in support of her motion to withdraw her guilty plea, including the transcript of her plea colloquy hearing; an affidavit from her attorney; an affidavit from the defendant herself; the transcript from the trial

of her former boyfriend, Haynes, in an unrelated case[2]; several investigative reports; and her prison medical records. In rendering a decision on the motion, the judge considered only the motion itself, the defendant's colloquy transcript, and the affidavits of the defendant and her attorney. He refused to consider the defendant's medical records, the investigative reports, and the transcript of Haynes's trial, stating that "[these] materials . . . are not in affidavit form and have been afforded no weight." The defendant contends that the motion judge erred in failing to consider all of the materials submitted with her motion.

As a general rule, a judge may decide a motion for a new trial based solely on affidavits, and additional testimony need not be heard. See *Commonwealth* v. *Lopez*, 426 Mass. 657, 663 (1998) ("It is . . . an axiom of rule 30(b) practice, . . . that the judge may decide a rule 30(b) motion based solely on affidavits"); *Commonwealth* v. *Pingaro*, 44 Mass. App. Ct. 41, 48 (1997). However, when a defendant attacks a conviction based upon a guilty plea, she has the choice between two tactics. "[S]he may stand on the contemporaneous record, the record made in the case through the stage of the colloquy and conviction. If the defendant chooses this route, it is not open to the Commonwealth to introduce extraneous evidence tending to show that the defendant in fact acted freely and intelligently in tendering the plea. . . . Alternatively, the defendant may offer extraneous evidence to supplement (or contradict) the record, but in that event the Commonwealth has a like right to offer evidence." *Commonwealth* v. *Nolan*, 19 Mass. App. Ct. 491, 492 (1985) (citations omitted). See *Commonwealth* v. *Foster*, 368 Mass. 100, 108 n.7 (1975) ("Where . . . the contemporaneous record is sufficient on its face, but the defendant claims that his plea was nevertheless involuntary or unknowing for reasons not appearing of record, not only may the defendant introduce relevant evidence, but the Commonwealth may respond with evidence to the contrary from outside the original record"); *Commonwealth* v. *Glines*, 40 Mass. App. Ct. 95, 100 (1996).

Here, the defendant elected the second alternative and offered additional evidence to contradict the record in this case. The

---

[2]Haynes was convicted of forcible rape of a child, indecent assault and battery on a child under fourteen, assault and battery, and assault and battery by means of a dangerous weapon. See *Commonwealth* v. *Haynes*, 45 Mass. App. Ct. 192 (1998).

judge relied on Mass.R.Crim.P. 30(c)(3), 378 Mass. 901 (1979), in deciding to give no weight to the materials that were not in affidavit form. While rule 30(c)(3) does require the party moving for postconviction relief to submit affidavits in support of the motion, it does not preclude the parties from introducing relevant evidence by other means, and there is no decisional authority requiring that evidence submitted to supplement or contradict the record in challenging a guilty plea be presented in the form of an affidavit.[3] See *Commonwealth* v. *Foster, supra; Commonwealth* v. *Glines, supra.*[4] The motion judge erred in concluding that he had no discretion to consider the materials that were not in affidavit form.

The motion judge's failure to consider the additional materials does not preclude us from reviewing the defendant's submissions. We are in as good a position as the motion judge, who was not the plea judge, to assess the strength of the defendant's claims. See *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992); *Commonwealth* v. *Curtis*, 417 Mass. 619, 626 (1994). Thus, we have considered all of the materials submitted in support of the defendant's motion.

(c) *The defendant's claim that Haynes inflicted the fatal injuries.* The defendant's first ground for the withdrawal of her guilty plea is that it was her former boyfriend Haynes who actually inflicted the fatal injuries on Garrett. In her affidavit, the defendant states that Haynes physically abused Garrett on a regular basis. On the day of Garrett's death, she claims that she took Garrett into the bathroom to clean him up after he vomited, and Haynes accompanied her. Haynes then began to push Garrett. At the direction of Haynes, she also pushed Garrett to the floor. She also states in her affidavit that "[b]y far, the greatest

---

[3]The motion judge cited *Commonwealth* v. *Duest*, 26 Mass. App. Ct. 137, 148 n.12 (1988), in concluding that he was not required to afford any weight to the materials that were not submitted in affidavit form. While the court in *Duest* did note that a trial transcript "is not an affidavit," it proceeded to consider the transcript from an unrelated trial in ruling on the defendant's motion to withdraw his guilty pleas. *Duest* does not support the motion judge's conclusion.

[4]Even if we assume that the defendant's supplementary materials could have been attached to affidavits, the Commonwealth did not object to the reliability of any of the defendant's documents during the proceedings on the motion for a new trial and cannot object now. Cf. *Commonwealth* v. *Glines*, 40 Mass. App. Ct. at 100 (defendant made no objection to the additional material offered during the evidentiary hearing on his motion for a new trial and could not do so on appeal).

number of blows and the most severe blows inflicted on Garrett prior to his death were inflicted by Paul Haynes."

The motion judge did not credit the defendant's affidavit, and we reach the same conclusion. The critical difficulty is that the affidavit, written four and one-half years after Garrett's death, contradicts the written statement she gave to the police shortly after Garrett's death — admitting that on the day of Garrett's death she repeatedly pushed him to the floor — and it contradicts her affirmation of her statement to the police at her plea hearing one year after Garrett's death. Moreover, the defendant admits in her affidavit that she participated in abusing Garrett on the day of his death.[5] There is no merit to the defendant's claim that Haynes was solely responsible for Garrett's death.

(d) *The defendant's claim that she lacked the state of mind necessary to support her conviction.* The defendant further claims that she is entitled to an evidentiary hearing or is entitled to withdraw her guilty plea because she lacked the mental state necessary to support her involuntary manslaughter conviction.[6] She argues that she cannot be held responsible for Garrett's death as either a principal or a joint venturer because she suffers from battered woman's syndrome. To the extent that she participated in "punishing" Garrett, she maintains that her will was overborne by the "psychological coercion" which Haynes inflicted upon her.

"The battered woman's syndrome[7] has been described as a 'series of common characteristics that appear in women who are abused physically and psychologically over an extended

---

[5]The defendant argued below, as she does here, that the transcript from the Haynes trial and the investigative reports indicate that Haynes abused other women and children, and that this evidence, along with the defendant's affidavit, demonstrate "a pattern of torture and abuse of children in his care." Evidence of Haynes's conduct with other children, or with Garrett, does not insulate the defendant from responsibility for her own conduct as principal or as joint venturer.

[6]"A defendant is guilty of involuntary manslaughter if the homicide he is charged with was (a) the unintentional result of an act committed with such disregard of its probable harm to another as to amount to wanton or reckless conduct, or (b) an unintentional death which results from the commission of a battery." *Commonwealth* v. *Nichypor*, 419 Mass. 209, 217 (1994).

[7]We note that G. L. c. 233, § 23F, regarding the admissibility of past physical, sexual or psychological abuse of a defendant, is not applicable in this case. The statute contemplates the defendant's use of force against a batterer. Here, the battered person was the child, not the defendant.

period of time by the dominant male figure in their lives.' "
*Commonwealth* v. *Moore*, 25 Mass. App. Ct. 63, 66 (1987),
quoting from *State* v. *Kelly*, 97 N.J. 178, 193 (1984). "Among
the characteristics of such abused women are a decrease in self-
esteem, an emotional dependence upon the dominant male and
[a] type of psychological 'learned' helplessness arising out of an
inability to predict or control the violence directed against
them." *Commonwealth* v. *Moore, supra*, quoting from *People* v.
*Torres*, 128 Misc. 2d 129, 132 (N.Y. Sup. Ct. 1985).

Violent behavior directed against women occurs in cycles
consisting of three stages. "During the first stage, there is mostly
verbal abuse, with minor physical abuse." Stage two is
"characterized by an escalation of the abuse 'until there is an
explosive instance where the woman is physically beaten up.' "
Stage three "consists of a respite, with no abuse for a short
period of time. This cycle continues throughout the relationship
with a decrease in the time between the batterings." *Com-
monwealth* v. *Lazarovich*, 410 Mass. 466, 471 (1991).

We conclude that the defendant's affidavit does not state facts
sufficient to demonstrate that she suffers from battered woman's
syndrome. The affidavit describes the cruelty of what she and
Haynes did to Garrett[8] rather than the beatings that she may
have suffered at the hands of Haynes. Although the defendant
has provided evidence that Haynes emotionally abused her,
there is no evidence that he physically abused her prior to Gar-
rett's death. The defendant indicates in her affidavit that Haynes
did not become physically abusive to her until *after* Garrett's
death. Thus, there is no evidence of "an explosive instance" of
violence between the defendant and Haynes prior to Garrett's
death. See *ibid.* Because the defendant has not provided suf-

___

[8]For example, the affidavit describes how Haynes spanked Garrett with
belts, vacuum tubes and brushes, and he would fasten clothespins to Garrett's
fingers, toes, and other parts of his body. Haynes directed the defendant to do
the same things, according to the affidavit. Haynes instructed his own son and
daughter to beat Garrett. On another occasion, the affidavit describes how
Garrett returned from school "touching his penis." Haynes told the defendant
to strike Garrett on his penis with a spoon. The defendant refused, and Haynes
grabbed a spoon and hit Garrett on his penis. Again Haynes told the defendant
to hit Garrett on his penis with a spoon, and the defendant complied. Then
Haynes forced Garrett to strike his own penis. Whenever Haynes became
upset he would strike Garrett on the head. In the days before his death, Gar-
rett fell down repeatedly, and Haynes would not permit the defendant to take
him to a physician. At the time of these events Garrett was about five years
old.

ficient evidence to demonstrate a cycle of abuse in her relationship with Haynes, her claim that she suffers from battered woman's syndrome cannot succeed.[9]

Furthermore, the defendant fails to demonstrate that she suffered from the "psychological 'learned' helplessness" associated with the battered woman's syndrome. *Commonwealth* v. *Moore*, 25 Mass. App. Ct. at 66. In her affidavit, she describes an occasion where she refused to obey Haynes's order to strike Garrett on his penis with a spoon. The description of this incident indicates that the defendant was capable of appreciating the wrongfulness of her actions. There is nothing in her affidavit to suggest that she was helpless or that she could not recognize her own misconduct.

The defendant also fails to explain adequately what happened to Garrett on the day of his death.[10] She states in her affidavit that "[a]t the direction of Haynes, I also pushed Garrett." This is the only explanation she provides for the actions that she took on that day. She does not claim that Haynes threatened to harm her physically if she did not push Garrett, nor does she claim that she feared that he would harm her if she failed to follow his instructions.

We conclude that the defendant has not sufficiently demonstrated that she suffered from battered woman's syndrome. As a result, her argument that she lacked the mental state necessary to support her manslaughter conviction because she suffered from battered woman's syndrome must fail. She has asserted no other grounds to support her claim that she should not be held responsible for her own conduct. Thus, the defendant has failed to raise a substantial issue regarding her claim that she lacked the requisite mental state to support her conviction.

At bottom, the defendant is claiming that her guilty plea was not voluntary, and we turn to that claim.

(e) *The defendant's claim that her guilty plea was not*

---

[9] The defendant also fails to demonstrate that she endured the cycle of abuse with any other "dominant male figure" in her life before she began her relationship with Haynes. *Commonwealth* v. *Moore*, 25 Mass. App. Ct. at 66. Her statements are too vague to demonstrate that the defendant went through the second stage of battered woman's syndrome with her former husband, which is characterized by "an explosive instance where the woman is physically beaten up." *Commonwealth* v. *Lazarovich*, 410 Mass. at 471.

[10] Moreover, the defendant's affidavit does not explain how Garrett sustained the two head traumas that preceded his death.

*voluntary.* The defendant claims she is entitled to withdraw her guilty plea because it was involuntary. She asserts that Haynes coerced her into pleading guilty. At the beginning of their relationship, Haynes told the defendant that he had a friend in the Mafia named Tony who would "take care of" any problems he (Haynes) had. When the defendant did not obey Haynes or if she displeased him in any way, he threatened her by making reference to Tony. The defendant also observed that Haynes possessed a handgun. Because she believed his statements about Tony and because she knew he owned a firearm, the affidavit states that she feared the consequences of displeasing or upsetting him.

The defendant's affidavit continues. After Garrett's death, the defendant claims that Haynes constantly told her what she should say to the police. He said that she should "cover" for him and assume sole responsibility for Garrett's death because he believed that he would receive a sentence of life imprisonment if he were charged and convicted for Garrett's death. Haynes instructed her to turn herself in to the police, which she did on May 6, 1992. While she was in custody, Haynes visited her and told her what to say to her lawyers and the authorities. He told her that she should plead guilty instead of going to trial because that would end the investigation, and he would not be charged. Haynes "pressured and warned" her to plead guilty. She stated that "[b]ecause I thought that I loved him and feared the consequences if I did not plead guilty, I chose to remain quiet about Haynes's involvement in Garrett's death and the pressure which he exerted on me to plead guilty."

"Where a defendant wishing to withdraw a guilty plea challenges the voluntary or intelligent nature of his plea, it is ordinarily the Commonwealth's burden to show by means of a contemporaneous or reconstructed record of the plea that it was entered understandingly and voluntarily." *Commonwealth* v. *Correa,* 43 Mass. App. Ct. at 716. See *Commonwealth* v. *Quinones,* 414 Mass. 423, 431-432 (1993). Here, the defendant does not claim that she made her plea unknowingly; rather she claims only that her plea was involuntary because it was made at the direction of Haynes.

"The concept of voluntariness . . . requires that the defendant tender the plea free 'from coercion, duress, or improper inducements.' " *Commonwealth* v. *Correa, supra* at 717, quoting from *Commonwealth* v. *Duest,* 30 Mass.

App. Ct. 623, 631 (1991). "To determine the voluntariness of the defendant's plea, the judge should conduct a real probe of the defendant's mind. . . . The judge should [also] determine whether the plea was 'being extracted from the defendant under undue pressure,' . . . whether the defendant was being treated for or was aware of any mental illness from which [s]he may be suffering, . . . and whether the defendant was under the influence of alcohol or drugs." *Commonwealth* v. *Correa, supra* at 717-718 (citations omitted).

The Commonwealth has met its burden of showing that the defendant's plea was made voluntarily. We have described the judge's probing colloquy with the defendant earlier in this opinion, including specifically the inquiry whether the defendant was threatened by anybody or whether anyone made promises to her in order to obtain the guilty plea. The defendant's answer was an unequivocal "no." That inquiry satisfied constitutional standards, see *Commonwealth* v. *Nolan,* 19 Mass. App. Ct. at 494-495, and the standards of Mass.R.Crim.P. 12(c)(5), 378 Mass. 869 (1979). The defendant makes no claim to the contrary.

The defendant's supplemental materials are not persuasive. Her affidavit offers two explanations for her guilty plea: (i) "Haynes told me that, rather than going to trial, I should plead guilty and take full responsibility for Garrett's death. *That way, the investigation would be over, and he would not be charged*"; and (ii) although the defendant told the judge no one had forced her to plead guilty, in fact "Haynes had pressured and warned me to plead guilty. Because *I thought that I loved him and feared the consequences if I did not plead guilty,* I chose to remain quiet about Haynes's involvement in Garrett's death." (Emphasis supplied.) The affidavit does not describe any coercion, and while it refers to a fear of the "consequences," the feared "consequences" are not identified, and in any event, these unmentioned consequences are fused with her alleged "love" for him — this for the man who, according to her affidavit, was principally responsible for the death by beating of her own son. Further, as noted earlier, the defendant's affidavit was written more than four years after her son's death. "That time interval engenders an initial skepticism about the defendant's argument that [her] plea[] w[as] coerced" by Haynes. *Commonwealth* v. *Facella,* 42 Mass. App. Ct. at 355.

While some of the defendant's materials do indicate that

Haynes carried a gun and that he told other women the same story he relayed to the defendant regarding his friend in the Mafia named Tony, this evidence, standing alone, does not bear on the issue of whether Haynes coerced the defendant into pleading guilty after Garrett's death, and the defendant's affidavit, when focused on the issue of coercion, makes no mention of Haynes's weapon, or of "Tony."

The defendant was represented by competent counsel who made an eloquent plea on her behalf for a substantially reduced sentence. Neither the record of the original proceedings, nor the supplementary materials, raise a substantial issue whether the defendant's plea was voluntary. The motion judge may — as he did here — discredit untrustworthy affidavits. There being no substantial issue raised by the motion or affidavits, no evidentiary hearing was required. See *Commonwealth* v. *Lopez*, 426 Mass. at 663. Whatever "pressure" Haynes may have put on the defendant, if any, to plead guilty in this case is not enough to convince us that this is a case which "truly warrants revisitation . . . in the interests of justice." *Ibid.* Based on the contemporaneous record of her plea hearing, as well as her affidavit, there is no triable issue, see *Commonwealth* v. *Pingaro*, 44 Mass. App. Ct. at 51 n.13, defeating any claim that the plea should be withdrawn in the interests of justice. See *Commonwealth* v. *Facella*, 42 Mass. App. Ct. at 355, quoting from *Commonwealth* v. *DeMarco*, 387 Mass. at 486-487 (a motion to withdraw a guilty plea is to be allowed only if "it appears that justice may not have been done").[11] See also *Huot* v. *Commonwealth*, 363 Mass. 91, 100 (1973) (sufficient evidence to demonstrate voluntary and knowing guilty plea under standard in effect prior to *Boykin* v. *Alabama*, 395 U.S. 238 [1969], where defendant admitted responsibility for homicide and admitted he realized the nature of the sentence).

We conclude that the defendant is not entitled to withdraw her guilty plea nor is she entitled to an evidentiary hearing.

3. *Motion for a psychiatric examination.* On December 2,

---

[11]The defendant also refers us to *Commonwealth* v. *Haynes*, 45 Mass. App. Ct. 192 (1998), Haynes's appeal from conviction of rape of a child and indecent assault and battery on a child under fourteen. The conviction was based on charges brought by unrelated third parties after the events in the case before us. The defendant in the instant case testified at Haynes's trial. No mention was made of her guilty plea, or of any alleged coercion that resulted in that plea. We attach no importance to the case involving Haynes's later conviction. See note 5, *supra*.

1997, the defendant filed a motion requesting that the court approve funds for an independent psychiatric examination pursuant to G. L. c. 261, §§ 27A-27G, in order to determine (1) whether she suffered from battered woman's syndrome or any other psychological disorder at the time of the alleged offense and (2) whether she lacked the state of mind necessary to support a conviction. In the alternative, she requested an examination by a psychiatrist designated by the court.

The motion judge found that the defendant was not entitled to an independent examination pursuant to G. L. c. 261, §§ 27A-27G. Chapter 261, § 27C(4), as amended by St. 1980, c. 539, § 7, assures an indigent defendant those fees or costs which are "reasonably necessary to assure [him] as effective a *prosecution, defense or appeal* as he would have if he were financially able to pay" (emphasis added). The defendant's request for an independent examination was made in connection with a postconviction Mass.R.Crim.P. 30(b) motion to withdraw her guilty plea. "[A] motion for postconviction relief . . . is distinguishable from an 'appeal,' which is ordinarily defined as '[r]esort to a superior (i.e. appellate) court to review the decision of an inferior (i.e. trial) court or administrative agency.' " *Commonwealth* v. *Davis*, 410 Mass. 680, 684 n.6 (1991), quoting from Black's Law Dictionary 96 (6th ed. 1990). Because the defendant's request in this case did not involve a "prosecution, defense or appeal," the judge denied the motion.

The defendant concedes that the motion judge did not err in refusing to provide her with funds for an independent psychiatric examination pursuant to §§ 27A-27G. However, she claims that the motion judge failed to consider her alternate claim that she is entitled to an examination by a court-appointed psychiatrist. It does appear from the motion judge's memorandum of decision that he failed to consider this claim.

The defendant asserts that she is entitled to an examination by a court-appointed psychiatrist pursuant to G. L. c. 123, § 15(*a*), as inserted by St. 1986, c. 599, § 38, which provides:

"Whenever a court of competent jurisdiction doubts whether a defendant in a criminal case is competent to stand trial *or is criminally responsible by reason of mental illness or mental defect,* it may at any stage of the proceedings after the return of an indictment or the issuance of a criminal complaint against the defendant, order an

examination of such defendant to be conducted by one or more qualified physicians or one or more qualified psychologists. . . . When an examination is ordered, the court shall instruct the examining physician or psychologist in the law for determining mental competence to stand trial and criminal responsibility." (Emphasis added.)

Even if the battered woman's syndrome defense were available to the defendant, it would not support her claim under c. 123, § 15(*a*). "Lack of criminal responsibility requires the existence of a mental disease or defect, which causes the defendant to lack the substantial capacity either to appreciate the wrongfulness of his or her acts, or to conform his or her conduct to the requirements of the law." *Commonwealth* v. *Hall*, 45 Mass. App. Ct. 146, 152 (1998), quoting from *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 515 (1997). Many courts have found that battered woman's syndrome is *not* a mental disease, defect or illness. See *Commonwealth* v. *Hall*, *supra* at 149 (expert witness testified that battered woman's syndrome is "not itself a diagnosis or an illness"); *United States* v. *Johnson*, 956 F.2d 894, 899-900 (9th Cir. 1992) ("Battered woman's syndrome is not a gross, identifiable mental defect"); *People* v. *Aris*, 215 Cal. App. 3d 1178, 1194 (1989) (battered woman's syndrome is not a mental illness); *State* v. *Borrelli*, 227 Conn. 153, 169 n.13 (1993); *Bechtel* v. *State*, 840 P.2d 1, 7 (Okla. Crim. App. 1992) (battered woman's syndrome is "not a mental disease in the context of insanity"). See also *United States* v. *Marenghi*, 893 F. Supp. 85, 91 n.10 (D. Me. 1995) ("There is no consensus among courts regarding whether the syndrome is properly characterized as a defect"). Rather, battered woman's syndrome is considered to be a form of post-traumatic stress disorder, which is "an anxiety-related disorder . . . occur[ring] in response to traumatic events outside the normal range of human experience." *State* v. *Riker*, 123 Wash. 2d 351, 359 (1994), quoting from *State* v. *Janes*, 121 Wash. 2d 220, 233 (1993). See *People* v. *Christel*, 449 Mich. 578, 588 n.15 (1995); *Commonwealth* v. *Stonehouse*, 521 Pa. 41, 62 (1989); *State* v. *Bednarz*, 179 Wis. 2d 460, 467 (Ct. App. 1993).

Here, the defendant has offered no evidence to show that battered woman's syndrome is a mental disease or defect that could have prevented her from being held criminally responsible for Garrett's death. Cf. *Commonwealth* v. *Hall*, *supra* at 153 (no error in refusal to instruct on lack of criminal responsibility

where, although expert opined that defendant suffered from battered woman's syndrome, nothing in expert's testimony indicated that the condition "either prevented [defendant] from understanding the wrongfulness of her behavior or prevented her from controlling her actions"). Thus, we conclude that the defendant is not entitled to an examination by a court-appointed psychiatrist based on her claim that she suffers from battered woman's syndrome.

The defendant also argues that she suffers from "other disorders that may have affected her conduct and state of mind." The defendant's medical records show that she has been diagnosed with "bipolar disorder" and depression. Again, the defendant has offered no evidence to show that these conditions constitute defects that could have precluded her from being criminally responsible for Garrett's death. Cf. *Commonwealth* v. *Mellone*, 24 Mass. App. Ct. 275, 281 (1987) (no error in refusal to allow psychiatrist's testimony that the defendant suffered from untreated bipolar disorder and alcoholism, where proposed testimony shed no light on defendant's capacity to form the specific intent to kill).

We conclude that the defendant was not entitled to a psychiatric examination by a court-appointed psychiatrist. The denial of the defendant's motions to withdraw her guilty plea, and for a psychiatric examination, is affirmed.

*So ordered.*

Dreben, J. (dissenting). I depart from the majority because I conclude the defendant is entitled to an evidentiary hearing on the issue whether her plea was voluntary.

"In determining whether a 'substantial issue' meriting an evidentiary hearing under rule 30[1] has been raised, we look not only at the seriousness of the issue asserted, but also to the adequacy of the defendant's showing on the issue raised." *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995), quoting from *Commonwealth* v. *Stewart*, 383 Mass. 253, 257-258 (1981). See generally Smith, Criminal Practice and Procedure

---

[1]Rule 30(b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 900 (1979), which is applicable when a defendant seeks to withdraw a plea, provides in relevant part: "The trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done."

§§ 1250-1260 (2d ed. 1983 & Supp. 1999). "It is elementary that a coerced plea is open to collateral attack." *Fontaine* v. *United States*, 411 U.S. 213, 215 (1973). *Huot* v. *Commonwealth*, 363 Mass. 91, 96 (1973). Moreover, the defendant has made a strong showing that her plea colloquy did not reveal the participation of a person who exerted undue influence upon her. This is not a case where the defendant "is limited to *[her] own plaintive allegations*" and is unable to "corroborate them in a post-plea voluntariness hearing." *Commonwealth* v. *Foster*, 368 Mass. 100, 106 (1975) (emphasis supplied). To the contrary, the defendant has from outside sources presented significant corroboration of her own allegations.

Although the voluntariness of a plea and the factual basis of the charge are distinct concepts, see *Commonwealth* v. *Fernandes*, 390 Mass. 714, 719 (1984), the latter can have an important bearing on the former. Just as the factual basis for a guilty plea (a requirement under Mass.R.Crim.P. 12[c][5][A], 378 Mass. 869 [1979]) "can be of significant assistance to the judge in the performance of his duty to ensure that the plea is voluntarily and intelligently made," *Commonwealth* v. *Morrow*, 363 Mass. 601, 608 (1973), a showing that significant facts supporting the plea are false can, and here does, raise the substantial question whether the defendant voluntarily entered her plea.

The supplementary materials[2] cast doubt on the veracity of statements made by the defendant to the police on October 17, 1991, which were relied on by the Commonwealth as the factual basis for the plea. They also lend credence to the claims in the defendant's affidavit that the plea was extracted from her by undue pressure from her former boyfriend, Paul Haynes.

1. *Facts presented at plea hearing.* The questions by the police and the defendant's answers, reproduced in the margin[3]

---

[2]As pointed out in note 4 of the majority opinion, *ante* at 310, the Commonwealth did not object to the reliability of any of the defendant's documents and cannot object now.

[3]QUESTION [relating to events of October 12, 1991]: "When you pushed him down, did Garrett's head hit anything else other than the floor?"

ANSWER: "I can't recall whether he hit anything else, he could have hit the hutch that is in the kitchen."

QUESTION: "Was anyone else in the house?"

ANSWER: "No."

and read by the assistant district attorney at the plea colloquy, set forth that on October 17, 1991, the defendant stated that *there was no one else in the house when the defendant pushed Garrett on the date of his death,* that she had also pushed Garrett in the same way four or five other times, that these punishments had begun in September,[4] and that *there was no one else*

QUESTION: "You did this to punish Garrett because he threw up?"

ANSWER: "Yes."

QUESTION: "Did you ever do this before?"

ANSWER: "Yes, it could have been four or five times."

QUESTION: "What happened?"

ANSWER: "Garrett was disobeying or not listening to me so instead of hitting him I kept pushing him onto the floor. I pushed him two to three times and every time I pushed him he got up and I pushed him again."

QUESTION: "What did he hit his head on when this happened?"

ANSWER: "The floor or the hutch."

QUESTION: "Where did this usually take place?"

ANSWER: "In the kitchen."

QUESTION: "Was anyone else there when this happened?"

ANSWER: "No, just myself."

QUESTION: "After you started pushing him, did he start having headaches?"

ANSWER: "Yes."

QUESTION: "About when did you start pushing him down?"

ANSWER: "Sometime around the beginning of September. About that time he started developing a lazy eye."

QUESTION: "Did he start vomiting a lot about this time?"

ANSWER: "It would be off and on."

QUESTION: "Why did you push him?"

ANSWER: "Because I did not want to hit him and I did not want to abuse him, but in the end I did."

[4]The abuse thus began when Haynes first came in contact with Garrett. Garrett returned to the defendant's residence at the end of August, 1991, after spending the summer in New Jersey. The defendant's relationship with Haynes began during the summer of 1991.

*present when they took place.* These statements will be shown to be open to serious question.

2. *Supplementary materials.* The supplementary materials will be described in some detail. That significant portions of the materials relate to Haynes's conduct with other women and children does not diminish their strength. See *Commonwealth* v. *Gallison,* 383 Mass. 659, 672-673 (1981); *Commonwealth* v. *Odell,* 34 Mass. App. Ct. 100, 103-104 (1993).

(a) *Evidence at Haynes's August, 1994 trial.* The partial transcript of Haynes's trial, in which he was convicted of the unrelated charges of forcible rape of a child and indecent assault and battery of a child under fourteen, provides a chilling picture of Haynes.[5] Accompanied by the present defendant, Deborah Conaghan,[6] Haynes moved into the home of the victims, Joyce and James, and their mother in January or February 1992. Joyce was then eleven, and James was nine years old.

Joyce's testimony was damning. Rebekah, the children's mother, began to hit them at the time of Haynes's arrival. Haynes hit them often, sometimes with a belt on their naked bodies. On several occasions he made them kneel on a pencil for hours in a corner. James received the brunt of Haynes's ire, and was hit at least five times a week. The children could not go to the bathroom without Haynes's permission, which was often withheld. Haynes forced James to spread his legs apart and then kicked him in the groin. He also directed Joyce to kick James in this manner. He punched James in the stomach with a closed fist "to toughen [him] up." In front of Joyce, on more than one occasion, Haynes put a cigarette lighter under James's penis and thereafter it "looked crispy like. . . . Not like skin, but like burnt paper." He also grabbed James by the hair on the back of his neck and lifted him up by his hair. According to Joyce, James was "[s]cared. He was real quiet. He would stay in his room most of the time." He did what Haynes said to do

---

[5]Our opinion, *Commonwealth* v. *Haynes,* 45 Mass. App. Ct. 192 (1998), affirming those convictions, had not been issued at the time of the defendant's submissions in support of her motion. The facts as stated in that opinion provide relevant background to my discussion. I refer to the fictitious names of the victims used in that opinion.

[6]Haynes and Conaghan moved out in May, 1992. As set forth in Conaghan's affidavit in this case, she turned herself in to the police on May 6, 1992. Haynes moved back to the victims' apartment about six weeks later.

and never defied him.[7]

Joyce wanted to be Haynes's daughter and had a sexual relationship with him. Haynes had told her that he was a Cherokee Indian and, in that tradition, in order to be his daughter Joyce had to have sex with him. Rebekah knew about some of the beatings and about the sex, and even told Joyce that it was all right for her to have sex with Haynes. Despite his behavior, Joyce trusted Haynes and did not want him to go to jail. For this reason, she never told anyone what went on in the household until she was moved to a foster home.

Rebekah, who was charged with rape of a child and indecent assault of a child under fourteen (Joyce was in each instance the victim), testified that soon after Haynes returned to the apartment, see note 6, *supra*, her mother became sick. She left Joyce and James with Haynes. In her absence, he changed the locks to the apartment and would not let her return to reside there. He let her in, however, to cash her welfare checks, the largest portion of which, together with food stamps, she gave to Haynes. Although she did not want to do so, Haynes persuaded her in December, 1992, to make him the guardian of her children. During her visits she observed Haynes abusing them. He was very severe with James. He made both children kneel on pencils on the kitchen floor with no clothes on. Because of her fear of Haynes she did not object to his invoking an alleged Indian tradition that, for a girl to be someone's daughter, the father had to be the first person to have sex with her. She saw Joyce perform fellatio on Haynes and also saw her having intercourse with him. Rebekah wanted to stab Haynes but refrained out of fear. She thought he would overpower her and that she and the two children "would end up dead." Accordingly, she did nothing.

Haynes would not permit Rebekah to speak to the children alone. When asked why she did not interfere with Haynes's treatment of the children, she answered because of her fear of him. Although he did not directly threaten her, his indirect threats were sufficient "to put a scare" in her. He told her he had "a friend Tony that took care of his problems or got rid of

---

[7]The foster mother with whom the children were placed noticed "their intense need to please and do the right thing and concern that if they didn't that they would be asked to leave, or they didn't know where they would go. They were really just very frightened about everything."

people [who] caused problems for him." He also told her he had a gun in his briefcase. She didn't dare tell anyone. "I didn't want to put anybody at risk for being eliminated if I reported him."

James's testimony confirmed Joyce's and was even more graphic as to the abuse he suffered at the hands of Haynes. He never told anyone because of fear that Haynes would "[t]ry and kill me or something."

Deborah Conaghan, the present defendant, also testified at Haynes's trial.[8] She told how he kissed and hugged Joyce and made her lift up her shirt. He hit both children with a belt with clothes off. Haynes showed Conaghan James's bruising to humiliate him. Conaghan was asked about Tony. He was described to her by Haynes as "[v]ery mean and just that when he wanted something he got it and didn't care how he got it." She testified that Haynes had shown her a gun. On cross-examination, when asked if she still loved him, she answered, "In a sense because of what we shared, yes."

Another former girlfriend of Haynes who met him in December, 1992, also testified. She confirmed the cruelty to James whom she described as always "walking on eggs." She never disclosed Haynes's treatment of the children because she was afraid. Haynes had told her about Tony who was Haynes's associate. "[T]here's almost like a vigilante-type thing. They took care of people who would hurt other people. They had this, like a warehouse that they would take people to and beat them up." Asked if Haynes had threatened her with Tony, she answered, "Not in so many words. What he would say is if anyone crossed him that he and Tony would, you know, take care of that person." The witness testified she was afraid of Tony and of Haynes.

(b) *Investigative reports from the district attorney's office.* Prior to Haynes's trial, the district attorney's investigations produced reports of other abusive behavior by Haynes. Some of these reports accompanied the defendant's motion and included

---

[8]When questioned whether she was threatened by Haynes with Tony she answered, "No." Before Conaghan testified, the assistant district attorney informed the judge that Conaghan was appealing her sentence (not withdrawing her plea) and was concerned that her testimony might adversely affect her appeal.

the following information.[9] A friend of Rebekah, "D," recounted that Rebekah feared Haynes and was controlled by him. Once "D" saw Haynes force Rebekah to strike James. Had she not done so, Haynes would have struck him. Haynes also made Rebekah write a letter ending her relationship with "D."

"S," who met Haynes in May 1993, married him about a month later, and broke up with him in July, 1993, reported that Haynes threatened that if she or anyone crossed him he had ways of taking care of such persons. Haynes had a gun and claimed to know a man named Tony who would take care of any problems if she did not cooperate.

Two other women, "W" and "L," recounted violent relationships with Haynes. "W," who had a daughter with Haynes, agreed to give the daughter up after Haynes worked on her for several months and threatened that, if she did not sign adoption papers, he would have her killed. She eventually moved into a motel with "L," a new girlfriend of Haynes, who had an eighteen month old son. She saw Haynes abusing the child — "she saw [Haynes] throw [him] into the shower." Once, when the child was being potty trained, Haynes took the child and "shoved his whole body into the toilet." When the child tried to get out, Haynes slapped him across the face. "W" saw Haynes beat the child every day for two or three weeks and also saw him hit the child with a sneaker. Haynes threatened "W" that if she told anyone what was going on, she would be killed by some of his friends in the Mafia.

Eventually "W" and "L" went to the police. Thereafter, once while "W" was walking, Haynes drove onto the sidewalk and sideswiped her with his car. She had seen him coming and had jumped, but the car nevertheless hit her foot and ankle. "W" stated that Haynes was charged with abuse of "L's" child and that she ("W") had testified at his trial.

"L" (and also her mother) confirmed much of what "W" had related to the investigator.[10] "L" stated that Haynes on occasion had threatened her with a gun, and had told her he was connected to the mob. He indicated if she told anyone that he had assaulted her, he would kill both her and her son. She was scared and felt threatened the entire time she was with him.

[9]The record discloses the names of the persons interviewed by the investigators. It is unnecessary to reveal the names in this account.

[10]In addition, the reports described physical abuse of women as well as rapes by Haynes.

3. *Adequacy of the defendant's showing.* Haynes, as depicted in the foregoing materials, was a man who was able to exert extraordinary power over women and children. Through intense fear, sometimes mixed with romance, he induced women and children to do his bidding, however cruel it might be.

The extensive evidence of Haynes's physical abuse of children, particularly boys, as shown by his treatment of James and "L's" eighteen month old child, creates doubt as to the veracity of at least some of the evidence introduced at the defendant's plea colloquy. That the defendant acted without Haynes, and that he, although living with her, was never present during any of the abusive episodes is simply not credible. Nor is it credible that such punishments were initiated and performed solely by the defendant. If, as seems likely, the defendant covered up for Haynes, there is a serious question as to why. In this context, and in light of Haynes's behavior with other women and their enormous fear of him, the defendant's claim in her affidavit that she was instructed to plead guilty by Haynes and was afraid not to do so becomes plausible. That claim as set forth in her affidavit was as follows:

> "51. During the plea hearing, the judge asked me if anyone had forced me to plead guilty. I answered no. However, Haynes had pressured and warned me to plead guilty. Because I thought that I loved him and feared the consequences if I did not plead guilty, I chose to remain quiet about Haynes'[s] involvement in Garrett's death and the pressure which he exerted on me to plead guilty."

The defendant's fear is also recounted in the following paragraphs:

> "26. At the beginning of my relationship with Haynes, he informed me that he worked for an individual named 'Tony' who was affiliated with the Mafia. Haynes stated that Tony would take care of any problems that Haynes had. Subsequently, when I did not obey Haynes or displeased him in any way, he threatened me by making reference to Tony.

> "27. I also learned that Haynes owned a handgun. I observed it while I was living with Haynes. Because I believed Haynes'[s] statements about Tony and knew that

Haynes owned a firearm, I feared the consequences of upsetting or displeasing him.''

In rejecting the defendant's affidavit as "untrustworthy," the majority lay stress on the statement she gave to the police admitting that she pushed Garrett to the floor on the day of his death and on the admission in her affidavit that she participated in abusing Garrett. In her affidavit, however, she also relates that she was instructed to strike Garrett on his penis with a spoon and when she refused, "Haynes grabbed a spoon and struck Garrett on his penis."[11] It is significant that one of Rebekah's friends told the district attorney's investigator that Haynes forced Rebekah to strike her son, and, had she not done so, he would have struck him. It is not too great an inference to assume that Haynes would have hurt the child with even greater force or might have struck Rebekah, if she had refused. The actions of the defendant are not, however, presently at issue.[12] What is before us is whether she has made an adequate showing that her guilty plea was not voluntary so as to entitle her to an evidentiary hearing on that question.

---

[11]In this context the last answer to the police read at her plea hearing and quoted in note 3, *supra*, takes on additional poignant meaning — "Because I did not want to hit him and I did not want to abuse him, but in the end I did."

[12]While her actions were certainly not those expected of a parent, if a new trial were granted, it would be open to the defendant to argue that undue pressure was exerted upon her, that is, she was coerced to participate in pushing her son. In this connection, G. L. c. 233, § 23F, as inserted by St. 1996, c. 450, § 248, contrary to the interpretation of the majority, would permit her, if she alleges a defense of coercion, to introduce "evidence by expert testimony regarding the common pattern in abusive relationships; the nature and effects of . . . psychological abuse . . . , including how those effects relate to the perception of the imminent nature of the threat of death or serious bodily harm; . . . and evidence whether the defendant displayed characteristics common to victims of abuse." See *United States* v. *Marenghi*, 893 F. Supp. 85, 95 (D. Me. 1995) (expert testimony may explain "how a reasonable person can nonetheless be trapped and controlled by another at all times even if there is no overt threat of violence at any given moment"). See also *Commonwealth* v. *Crawford*, 429 Mass. 60, 66 (1999) (defendant entitled to place evidence through her expert that she was incapable of refusing to answer questions put to her by police); *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 640, 642 (1997) (victim's vacillating behavior toward defendant-abuser proper subject of expert testimony). That a new trial might result in the defendant's conviction of a lesser crime, or lead a judge to impose a sentence less than the current one to M.C.I. Framingham of not less than twelve years nor more than eighteen years, are possibilities if the facts as alleged in the defendant's affidavit turn out to be credible. See *United States* v. *Johnson*, 956 F.2d 894, 902-903 (9th Cir. 1992).

Another reason the majority is unpersuaded is the length of time between the defendant's plea and her motion to withdraw it — more than four years. An examination of the defendant's medical records at M.C.I. Framingham provides at least a partial explanation for her delay in asserting her contentions. The numerous notes from her mental health counselor indicate that prime problems addressed in therapy were the defendant's inability to assert herself and recognize her own needs, and the need to decrease her "people pleasing behavior (especially saying no when appropriate)." The delay could be explored at a hearing.

In sum, the necessary factual determinations cannot be made on this record. Questions of credibility remain to be resolved by an evidentiary hearing. See *Ciummei* v. *Commonwealth,* 378 Mass. 504, 510 n.9 (1979) ("if a defendant asserts that despite a seemingly adequate exchange there was coercion, mental incompetency, or other factors that belied the record showing . . . a [postconviction] proceeding would be perforce appropriate"). See also *Fontaine* v. *United States,* 411 U.S. at 215, where the Court in requiring such a hearing stated, "The objective of Fed. Rule Crim. Proc. 11, of course, is to flush out and resolve all such issues, but like any procedural mechanism, its exercise is neither always perfect nor uniformly invulnerable to subsequent challenge calling for an opportunity to prove the allegations."[13]

---

[13]But see *Commonwealth* v. *Moreau,* 30 Mass. App. Ct. 677, 683 n.3 (1991), cert. denied, 502 U.S. 1049 (1992), noting (prior to the amendment of 28 U.S.C. § 2255 by Pub. L. No. 104-132 [1996]) that the Federal statutes "facially are more generous in favoring hearings than is Mass.R.Crim.P. 30(c)(3), 378 Mass. 901 (1979)."