## COMMONWEALTH vs. PAUL C. HAYNES.

No. 96-P-0108.

Bristol. November 3, 1997. - July 17, 1998.

Present: PERRETTA, KASS, & GREENBERG, JJ.

*Rape. Rape-Shield Statute. Evidence,* Impeachment of credibility. *Witness,*
Credibility. *Practice, Criminal,* Required finding, Lesser included offense,
Instructions to jury.

At the trial of indictments for forcible rape of a child and indecent assault and
battery on a child under fourteen, the judge correctly excluded evidence of
the victim's prior allegation of rape, where the allegation was not shown to
be false, did not suggest a pattern of similar accusations, and, in the
circumstances, would not have had any significant impact on a central is-
sue of the trial, namely, the victim's credibility. [199-201]

At the trial of indictments, the evidence was sufficient to support the jury's
conclusion that the defendant had used force in the rape of a child. [201]

At the trial of an indictment for forcible rape of a child, no substantial risk of
a miscarriage of justice was created by the judge's erroneous instruction on
the issue of consent, which defense counsel neither objected to nor sought
correction of, where consent was not an issue; nor was a substantial risk of
a miscarriage of justice created by the judge's failure to instruct on the
lesser included offense of statutory rape, which instruction the defendant
did not request in an apparent tactical decision. [201-203]

INDICTMENTS found and returned in the Superior Court Depart-
ment on August 11, 1993.

The cases were tried before *Richard F. Connon,* J.

*David M. Skeels,* Committee for Public Counsel Services, for
the defendant.

*Catherine B. Sullivan Ledwidge,* Assistant District Attorney,
for the Commonwealth.

PERRETTA, J. On his appeal from convictions by a jury on
indictments charging him with forcible rape of a child and
indecent assault and battery on a child under fourteen, the
defendant argues that the trial judge erred in excluding evidence

of the victim's prior false allegation of rape and, with respect to the indictment charging forcible rape, in denying his motion for a required finding of not guilty, and in instructing the jury.[1] We affirm the convictions.

1. *The evidence.* According to the testimony of Rebekah (the mother of the victims, Joyce and James[2] ), she and her children were living together in an apartment in Taunton when, sometime in January or February, 1992, she met the defendant through a telephone dating service. At that time, the defendant was involved in a relationship with another woman, Deborah Conaghan. However, the defendant told Rebekah that Conaghan was his sister. Shortly after Rebekah became acquainted with the defendant, he and Conaghan moved from Holliston to Taunton and into Rebekah's apartment. Rebekah supported the entire household with her public assistance checks and food stamps.

Sometime in May or June, 1992, the defendant and Conaghan moved out of the apartment. About six weeks later, the defendant returned.[3] Soon thereafter, Rebekah's mother became ill, and Rebekah left Joyce and James with the defendant and went to live with and take care of her mother. In her absence, the defendant changed the locks to the apartment and told her that the children did not want her to return to live with them. When Rebekah's mother's landlord, a housing authority, would not allow Rebekah to stay in the apartment, she lived in various shelters. In December, 1992, Rebekah made the defendant the guardian of Joyce and James.

According to Rebekah, although she was denied free access to her former apartment, she would return there to visit the children and to turn her checks and food stamps over to the defendant. Rebekah testified that, during those visits, she saw the defendant administer physically abusive punishment to both her children. She was also present when the defendant told Joyce that, if she wished to be his daughter, he would have to

---

[1]The defendant's conviction on an indictment charging him with assault and battery was placed on file with his consent, and he makes no argument on appeal concerning his conviction on an indictment charging him with assault and battery by means of a dangerous weapon, a cigarette lighter.

[2]The victims' names are fictitious. Joyce, the subject of the rape and indecent assault and battery indictments, was born on June 23, 1980, and James, the victim of the assault and battery by means of a dangerous weapon, was born on December 27, 1982.

[3]The defendant's twelve year old son also came to live in the apartment in the summer of 1992.

teach her about life and sex. She saw the defendant and Joyce engage in intercourse and fellatio. Rebekah testified that she did nothing to help Joyce and James because she feared the defendant. He had told her that he carried a gun in his briefcase and that he had friends who would take care of anyone who caused him problems.

Rebekah acknowledged that she too had been charged with sexually abusing Joyce and that she had agreed to cooperate with the Commonwealth. She had pled guilty to indictments charging her with rape and indecent assault and battery, and was awaiting sentencing. It was her understanding that the Commonwealth intended to recommend a period of incarceration of from five to seven years at M.C.I., Framingham.

Both Joyce and James testified. Joyce told the jury of the indecent touchings and rapes of her by the defendant which began soon after he had moved into the apartment and which sometimes occurred in her mother's presence. She described how the defendant had told her that it was part of American-Indian tradition for a father to be the first to have sex with his daughter and how her mother explained to her that it was permissible for her to engage in sexual acts with the defendant.

Joyce described how she was afraid but nonetheless did as the defendant told her because she wanted to be his daughter. When she told the defendant during intercourse that he was hurting her, he simply told her not to scream. Joyce also described the spankings given to her and James by the defendant, sometimes with a belt on their bare flesh. She explained that she told no one about the defendant's abuse of her because he had warned that should she do so he would have to go to jail. When, in March, 1993, the Department of Social Services (DSS) removed James and her from the apartment and the defendant's custody, the last statement that the defendant made to her, as related by Joyce, was "don't tell." About four months later, Joyce told her foster mother about the defendant's acts upon her.[4]

James told of the defendant's physical abuse of him, which included an incident in which the defendant held a lit cigarette lighter to his penis. Both children testified that they had seen a gun in the defendant's briefcase.

Conaghan testified that she lived with the defendant from

---

[4]The foster mother gave "fresh complaint" testimony.

July, 1991, until May of 1992. At the time the defendant met Rebekah, Conaghan and he were having problems with their apartment, and the defendant suggested that they move in with Rebekah, telling her that Conaghan was his sister. Conaghan stated that she, Rebekah, the children, and the defendant lived on Rebekah's assistance checks, food stamps, and handouts from the defendant's friends. Further corroborating Rebekah and the children, Conaghan testified to the beatings and other humiliating punishments inflicted upon Joyce and James by the defendant. She also related that the defendant was always kissing and hugging Joyce, making her sit on his lap, and lifting her shirt to display her breasts. She stated that she had seen a gun in the defendant's briefcase and that he had told her that he had a friend, "Tony," who was involved with the "Mafia."

Another woman, Susan Coury, testified that she met the defendant, in December, 1992, through a telephone dating service and that she frequently visited him at his apartment in Taunton until the relationship ended about three months later. She described how, during those visits, the defendant was always punishing James. She saw the defendant slap James across the face on two occasions and make the children kneel on pencils. She described James and Joyce as always attempting to please him. Coury also told how one of the defendant's friends, Melissa Hadley, would sometimes be at the apartment. Although the defendant would criticize and ridicule Hadley's appearance in her absence, it appeared to Coury that he and Hadley were romantically involved. Coury never said anything to the defendant about his treatment of the children because she was afraid of him. He had told her that he had a friend, "Tony," who belonged to a "vigilante-type group" that "took care of people who would hurt other people."

The doctor who examined Joyce testified that she was brought to her office on April 16, 1993, by two DSS social workers who provided her with background information. The doctor testified that her examination of Joyce revealed that she had a healed tear on the lower edge of her hymen, which was consistent with penile penetration.

Called to testify by the defendant, Melissa Hadley stated that she met the defendant in 1991. From June, 1992, through March, 1993, she would be at the Taunton apartment with the defendant, Joyce, and James on a daily basis. She never saw the defendant harm either of the children. He would discipline them by mak-

ing them stand in a corner or go to their rooms. He never spanked them: "A light tap on the butt but nothing more than that." After Joyce and James were removed from the apartment by DSS in March, 1993, Hadley and the defendant moved into an apartment in Grafton. They lived in that apartment until May 13, 1993, when the defendant married a woman named Debra Smith and moved to Stow. Hadley stayed with her parents until July, 1993. At that time, and upon the defendant's invitation, she moved in with him and his wife in Stow until the wife, three months later, asked her to leave. According to Hadley, the defendant did not work when they lived in Grafton or Stow, but he did do "odd jobs" while living in Taunton.

Testifying on his own behalf, the defendant described how, while living with and being supported by Conaghan, he met Rebekah through a telephone dating service. He denied ever telling Rebekah that Conaghan was his sister. He also stated that it was Rebekah's idea that he and Conaghan move in with her so that they could share expenses. He and Conaghan moved out of Rebekah's apartment in May because he did not approve of the way Rebekah was raising her children. She never disciplined them, and she allowed them to watch too much television. After he left, Rebekah continuously called and begged him to come back, saying that the children missed him. He returned, without Conaghan, about six weeks after he had left.

Soon after his return, Rebekah told him that she could no longer deal with the children and needed a break from them. When her mother became ill and needed her help, he agreed to take care of Joyce and James for a few days. When Rebekah's absence became prolonged, he began asking her to come back, but she would say that she wasn't ready. Because of Rebekah's absence, he had to assume full responsibility for the children as well as all the household chores. A friend, Melissa Hadley, would sometimes help him with the children and assist with various errands.

In caring for the children, the defendant restricted the amount of time that they could watch television, and he disciplined them when they misbehaved. However, he never beat or kicked James, nor did he ever hold a cigarette lighter to his penis. Rather, the defendant explained, James accidentally sat on a soldering iron that burned through his thin pajamas. The defendant also stated that he and the landlord changed the locks

on the apartment. He stated that although he did not give Rebe-
kah a new set of keys, the landlord did. Rebekah, however,
chose not to use the new set of keys and would always knock
on the door to gain access to her apartment. The defendant
explained about the gun to which previous witnesses had testi-
fied. The gun was a toy that belonged to his son who had left it
behind during a visit with the defendant at his previous apart-
ment in Holliston. When the defendant moved from that apart-
ment to Taunton, he had packed it in his briefcase.

The defendant also denied ever telling Joyce that it was Indian
custom for a father to introduce his daughter to sex. He
explained that he had discussed with Joyce and his son[5] that he
(the defendant) "was part Cherokee Indian" and that his former
wife "is a Passamaquoddy Indian." Joyce and his son became
interested in the topic and would read books, taken from the
library by Joyce, about Indian culture.

On cross-examination, the defendant stated that he never
abused Joyce or James and that he never engaged in any sexual
activity with Joyce. Although he knew Hadley loved him, he
did not reciprocate those feelings and had told her so. He
acknowledged that Hadley would loan him money on occasion,
but he denied that he ever ridiculed her to anyone. The
defendant also stated that he had known Debra Smith previ-
ously and became reacquainted with her through a telephone
dating service. He also stated that it was he and not she who
ended their brief marriage by an annulment. When asked
whether he had a friend named Tony, the defendant stated that
he knew several people with that name, but he never told anyone
that he had a friend by that name who would take care of anyone
causing him (the defendant) a problem.

2. *The false allegation of rape.* In the course of pretrial
discovery, the defendant was furnished with a DSS document
that was alleged to contain a one-line reference to a statement,
made by Joyce to a DSS social worker, that her stepgrandfather
had inserted a carrot into her vagina.[6] Because Joyce stated dur-
ing a subsequent interview that she had no independent memory
of any such incident but that Rebekah and the defendant had
told her it had happened, the Commonwealth brought a motion
in limine seeking a ruling that no mention of the allegation be

---

[5]See note 3, *supra.*

[6]Neither the prosecutor nor defense counsel could find the DSS report
which, consequently, was never produced for the trial judge.

made at trial. The trial judge took up the motion after empanelment of the jury, and defense counsel argued that the statements were admissible as false allegations of rape. See *Commonwealth v. Bohannon*, 376 Mass. 90 (1978). Because no one could find and provide the trial judge with the DSS report, he ruled that the statement was inadmissible because there was no factual basis from independent third-party records to support a conclusion that the accusation had been made and was, in fact, untrue. See *id.* at 95. Defense counsel then represented that the anticipated medical testimony would show the condition of Joyce's hymen and that the stepgrandfather's alleged act would be admissible under the "rape shield" statute, G. L. c. 233, § 21B, to explain that condition.[7] Because the doctor would not be available until the next day, the parties agreed to proceed with the trial and make no mention of the disputed evidence until after an in camera hearing on the motion in limine. In the meantime, no mention was to be made of the disputed evidence.

There the matter stood until the doctor, the last of the Commonwealth's witnesses, became available. Joyce testified on voir dire that she never had an independent memory of her stepgrandfather molesting her with a carrot. Rather, she had told the DSS social worker that Rebekah and the defendant had told her that she (Joyce) would awaken in the middle of the night and "write things down on a piece of paper, what's in my subconscious" and that one of the things they told her that she had written down was that her stepgrandfather had molested her with a carrot. She explained that she now believed it never happened because neither Rebekah nor the defendant ever showed her any of her supposed writings and she was certain that had such a thing been done to her she would remember.

Joyce acknowledged that she had told the pediatrician that she was not a virgin and that her stepgrandfather had molested her. She testified that she made this statement to the doctor because she knew she was about to be examined and, at that time, she still trusted the defendant and did not want to get him in trouble.

---

[7]As amended by St. 1983, c. 367, the statute provides in relevant part: "Evidence of specific instances of a victim's sexual conduct . . . shall not be admissible except . . . evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however, that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof."

At the conclusion of Joyce's voir dire testimony, the trial judge suggested that defense counsel might wish to ask the pediatrician who had examined Joyce whether her condition could have been caused by the alleged act of the stepgrandfather. The doctor was then questioned on voir dire. Defense counsel asked whether Joyce had told her whether she had ever had intercourse. The doctor responded that Joyce had told her only that she was not a virgin and that any other information she had concerning Joyce had been provided by DSS. Defense counsel did not put a single question to the doctor about possible causes of the tear in Joyce's hymen, and he declined the trial judge's invitation to make an offer of proof.

Based upon the testimony elicited during the voir dire, the trial judge concluded that, because there was nothing to show that the alleged act of the stepgrandfather could have caused Joyce's condition, her statements concerning that act were inadmissible under G. L. c. 233, § 21B. On appeal, the defendant does not challenge that conclusion and, instead, argues that, because Joyce's statements constituted false allegations of rape, they were admissible under the *Bohannon* exception to the general rule of exclusion of evidence of prior false allegations.

We do not agree. This case involves none of the "special circumstances" necessary for an application of the *Bohannon* exception. " '[T]he exception to the general rule barring evidence of prior false accusations is a narrow one. *Bohannon* . . . involved "special circumstances," *Commonwealth* v. *Sperrazza*, 379 Mass. 166, 169 (1979) . . . and is applicable only in "unusual fact situations where justice demands." *Commonwealth* v. *Trenholm*, 14 Mass. App. Ct. 1038, 1039 (1982).' *Commonwealth* v. *Hicks*, 23 Mass. App. Ct. 487, 489 (1987)." *Commonwealth* v. *McDonough*, 400 Mass. 639, 650 (1987).

First, we do not regard Joyce's statement as being a false accusation within the true sense of the *Bohannon* exception. "Essentially, this exception acts as a 'crying wolf' defense. The defendant is entitled to cross-examine an alleged victim about a pattern of false accusations or 'crying wolf' . . . ." *Commonwealth* v. *LaVelle*, 414 Mass. 146, 152 n.4 (1993). Joyce testified that, at the time she made the statement to the DSS social worker, she believed it because she believed her mother and the defendant. Further, the statement was not shown to be, in fact, false. Rather, all that was shown was that, because

Joyce had no independent memory of the event and no longer believed her mother or the defendant, she no longer believed that the act had occurred.

According to Joyce's testimony, Rebekah and the defendant told her that the molestation by the stepgrandfather occurred while he was taking care of her after the defendant left the apartment in May, 1992, for six weeks. Further, the "allegation of sexual misconduct against a single individual, . . . [the stepgrandfather], 'fell short of suggesting [the] pattern of similar accusations' in *Bohannon.*" *Commonwealth* v. *Hicks,* 23 Mass. App. Ct. 487, 490 (1987).[8]

Lastly, we do not think that the excluded statement would have had any significant impact on a central issue of the trial. The defendant's theory of defense was that the acts set out in the indictments never happened. He argues that, because Joyce's statement about the act of her stepgrandfather would have provided the jury with a plausible alternative explanation for the tear in her hymen, he was severely prejudiced by its exclusion. This argument, however, ignores the fact that, because of the trial judge's ruling concerning the inadmissibility of the statement under § 21B (about which the defendant makes no argument), evidence of Joyce's statement could not have been used substantively to explain that condition. Rather, evidence of a false allegation of rape is relevant only on the issue of a witness's "ability, readiness, or proclivity to lie and fabricate." *Commonwealth* v. *Nichols,* 37 Mass. App. Ct. 332, 336 (1994).

Joyce's testimony concerning the specific crimes that were the subject of the trial was neither inconsistent nor confused. Her assertions that she had experienced intercourse were supported by the doctor's testimony that the tear in Joyce's hymen was consistent with penile penetration. Joyce's account of the defendant's sexual misconduct was corroborated by Rebekah, and her testimony concerning other facts about the defendant, some more significant than others but all denied by him, was substantiated by several other witnesses who were not shown to have any particular bias or motive to lie. Also, as earlier noted, Joyce's statement to the DSS social worker was *not* that she

---

[8]Nor is the allegation brought within the scope of *Bohannon* by the fact that Joyce, soon after speaking with the DSS social worker, may have repeated her statement to the doctor who, on voir dire, did not corroborate the repetition and testified that all her information about Joyce, other than her lack of virginity, had been provided by DSS.

had, in fact, been molested by her stepgrandfather but, rather, that Rebekah and the defendant told her that she had. Given these circumstances, we do not think that the evidence concerning the statement would have made a significant impact on Joyce's credibility. See *Commonwealth* v. *LaVelle*, 414 Mass. at 152. Cf. *Commonwealth* v. *Bohannon*, 376 Mass. at 95.

We see nothing in the circumstances of this case that leads us to conclude that justice demands application of the *Bohannon* exception and a reversal of the defendant's convictions.[9]

3. *Sufficiency of the evidence*. Claiming a lack of evidence of physical force or threats of bodily harm, the defendant argues that he was entitled to a required finding of not guilty on the charge of forcible rape.[10] This argument is disposed of by *Commonwealth* v. *Caracciola*, 409 Mass. 648, 653 (1991), in which the court held: "As we read the statute, the force needed for rape may, depending on the circumstances, be constructive force, as well as physical force, violence, or the threat of bodily harm." See *Commonwealth* v. *Moniz*, 43 Mass. App. Ct. 913, 913-914 (1997), and cases therein cited. Taking the evidence in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), we see no error in the denial of the defendant's motion.

4. *The jury instructions*. At the close of the evidence, the trial judge informed the Commonwealth and the defendant that he was not going to instruct the jury on the lesser included offense of statutory rape. The Commonwealth objected and argued that if the instruction were not given and the jury were to find that intercourse had occurred but without force, they could find the defendant not guilty. The trial judge stood firm in his refusal to give an instruction on the lesser offense, and defense counsel remained silent.

In his jury instructions on the indictment charging the

---

[9] The defendant argues for the first time on appeal that Joyce's statement to the doctor, that anything revealed by the examination was because of her stepgrandfather, was inconsistent with her testimony at trial. The same circumstances that lead us to conclude that the statements were not admissible under the *Bohannon* exception also lead us to conclude that any error in refusing to allow Joyce's statement to the doctor to be used as evidence of a prior inconsistent statement does not rise to the level of a substantial risk of a miscarriage of justice.

[10] When the trial judge asked defense counsel whether he also had a motion on the lesser included offense, he responded, "I may. I don't want to be heard now."

defendant with rape of a child, the trial judge stated: "The Commonwealth must prove that, at the time of penetration, the defendant [*sic*] did not consent. You may consider evidence of the victim's state of mind at the time of the alleged incident on the issue of consent. As a matter of law, a child under the age of sixteen is incapable of giving consent." This instruction is erroneous "because it permitted the jury to convict the defendant of rape of a child with force in the absence of any proof that the victim did not consent." *Commonwealth* v. *Tatro*, 42 Mass. App. Ct. 918, 920-921 (1997). However, defense counsel made no objection to the instructions.[11]

On appeal, the defendant argues that, because the issue of consent was raised by the evidence, the trial judge's failure to instruct on the lesser included offense and his erroneous instruction, that a minor is incapable of consenting, created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Woodward*, 427 Mass. 659, 664 (1998).

Consent was never an issue raised at trial by the defendant. From the opening statement through the closing argument, the theory of defense was that none of the acts against Joyce or James ever occurred, and the defendant so testified. See *Commonwealth* v. *Tatro*, 42 Mass. App. Ct. at 921. Further, when defense counsel moved for a required finding of not guilty at the close of the Commonwealth's evidence, he declined even to address the lesser included offense, see note 10, *supra*. Additionally, defense counsel remained silent in the face of the Commonwealth's request for and argument in support of an instruction on the lesser included offense of statutory rape, compare *Commonwealth* v. *Woodward*, 427 Mass. at 662 (defendant objected to Commonwealth's request for jury instruction), and he neither objected to nor sought correction of the erroneous instruction given on the consent element of forcible rape. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 737-739 (1990) (no substantial risk of miscarriage of justice in refusal to instruct on lesser included offense where such an instruction was not requested and would have been inconsistent with trial strategy seeking complete acquittal). See also *Commonwealth* v. *Pagan*, 35 Mass. App. Ct. 788, 790-792 (1994).

---

[11]Another error, unnoticed by defense counsel or the Commonwealth below or on appeal, is in the first quoted sentence. Obviously, it was the consent of the *victim*, not the defendant, that was at issue, and we have no doubt that the jury could not have been misled.

Because the claimed errors in the instructions were not "sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error[s]" and because it is not "inferable from the record that counsel's failure to object was not simply a reasonable tactical decision," *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986), we conclude that the jury instructions did not create a substantial risk of a miscarriage of justice requiring reversal of the defendant's conviction on the indictment charging him with forcible rape of a child.

*Judgments affirmed.*