## COMMONWEALTH *vs.* DEBORAH CONAGHAN.

Worcester. September 7, 2000. - December 22, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Practice, Criminal,* Postconviction relief, Defendant's competency, Plea, Affidavit. *Evidence,* Guilty plea. *Battered Woman Syndrome. Mental Impairment. Statute,* Construction.

A criminal defendant's motion for a new trial, based on an assertion that she was not competent, due to battered woman syndrome, voluntarily to plead guilty to manslaughter in the death of her minor son, should not have been denied without an examination or examinations, as requested, pursuant to G. L. c. 123, § 15 (*a*), by an expert in battered woman syndrome, where the materials submitted in support of the motion raised a substantial issue requiring such an examination [106-109]; further, in the circumstances, the more than four-year delay in filing the defendant's motion did not render the claims less credible [109-110]. SPINA, J., joined by ABRAMS, J., concurring. SOSMAN, J., joined by GREANEY, J., and IRELAND, J., dissenting.

INDICTMENT found and returned in the Superior Court Department on April 17, 1992.

A motion to withdraw a guilty plea, filed on April 29, 1997, and a motion for a competency examination, filed on December 2, 1997, were heard by *Herbert F. Travers, Jr.,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Dana Alan Curhan* for the defendant.

*Anne S. Kennedy,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. We granted the defendant's application for further appellate review, see *Commonwealth* v. *Conaghan,* 48 Mass. App. Ct. 304 (1999), to determine, among other issues,[1] whether

[1]Conaghan's motion to withdraw her guilty plea was based on the grounds that (1) there is substantial evidence that her former boy friend inflicted the fatal injuries on Conaghan's son; (2) to the extent that she may have contributed to her son's death she suffered from battered woman syndrome and lacked the competency to plead voluntarily; and (3) that plea was the product of intimidation and coercion and therefore not voluntary. She also

Conaghan's motion for a competency examination or examinations pursuant to G. L. c. 123, § 15 (*a*),[2] was erroneously denied. Conaghan filed her motion four and one-half years after she pleaded guilty to manslaughter in the death of her minor son.

1. *The standard.* A postsentence motion to withdraw a plea is treated as a motion for a new trial. See *Commonwealth* v. *Russin*, 420 Mass. 309, 318 (1995), quoting Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). A "plea is valid only when the defendant offers it voluntarily, with sufficient awareness of the relevant circumstances, *Brady* v. *United States*, 397 U.S. 742, 748-749 (1970), and with the advice of competent counsel. *Id.* at 758." *Commonwealth* v. *Fernandes*, 390 Mass. 714, 715-716 (1984). "[A] guilty plea is void if it is involuntary and unintelligent for any reason." *Huot* v. *Commonwealth*, 363 Mass. 91, 96 (1973).

We conclude that Conaghan's motions cannot be decided without examination or examinations by an expert in the field of battered woman syndrome. We therefore vacate the order denying her an examination or examinations pursuant to G. L. c. 123, § 15 (*a*), on the issue of competence to assist her counsel and to enter a voluntary plea of guilty. *Dusky* v. *United States*, 562 U.S. 402 (1960). We remand this matter to the Superior Court which should order an examination or examinations pursuant to G. L. c. 123, § 15 (*a*), by an expert in battered woman syndrome, and for such further proceedings as are needed in light of the expert's opinion.

2. *Conaghan's plea hearing.* At the plea hearing, the assistant district attorney read Conaghan's statement to the police concerning the events surrounding her son's death. Conaghan told the police that no one else was in the house when she pushed her son and that she previously had pushed him in the same manner four or five other times. Additionally, she stated

filed a motion to receive funds for an independent psychiatric examination or examinations pursuant to G. L. c. 261, §§ 27A-27G, which was denied. See *Commonwealth* v. *Davis*, 410 Mass. 680, 684 (1991). Conaghan also requested a court-ordered psychiatric examination or examinations pursuant to G. L. c. 123, § 15 (*a*), which was denied. On appeal she argues that it was error to deny her request for an examination or examinations pursuant to G. L. c. 123, § 15 (*a*).

[2]General Laws c. 123, § 15 (*a*), reads in pertinent part: "Whenever a court of competent jurisdiction doubts whether the defendant in a criminal case is *competent to stand* trial or is criminally responsible by reason of mental illness or mental deficit . . ." (emphasis supplied).

that these punishments had begun in September, 1991,[3] and that there was no one else present when they took place. Conaghan also stated twice in response to the judge's questions that she was pleading guilty out of her own free will. The trial judge[4] specifically asked her whether anybody had threatened her or made promises in order to get her to plead guilty and she replied, "No."

(a) *Materials in support of motion to withdraw guilty plea and for new trial.* In support of her motion to withdraw the guilty plea and for a new trial, Conaghan filed supplementary materials regarding Paul Haynes's violent conduct with other women and children; an affidavit narrating her own history of physical and psychological abuse, and some of her psychiatric and medical records since her incarceration. The judge concluded that there was nothing in Conaghan's affidavit creating a substantial issue that would require a psychiatric examination or examinations and an evidentiary hearing.

(b) *Conaghan's affidavit.* In 1991, Conaghan met Paul Haynes. Shortly after beginning a relationship with Haynes, he moved in with her. Because Haynes was unemployed, Conaghan used her earnings and child support payments to pay his rent and bills. Haynes told Conaghan that he worked for an individual named "Tony" who was affiliated with the mafia. Haynes would often threaten Conaghan with Tony if she did not obey him or if she displeased him in any way. While she was living with Haynes, she learned that Haynes also owned a gun. Haynes ordered Conaghan to punish her son physically in order to cure his behavioral problems and illnesses. Haynes also physically punished Conaghan's son. At Haynes's direction, Conaghan assisted him. According to Conaghan, prior to Haynes's moving in she had only punished her son through nonphysical means.

Conaghan stated in her affidavit that Haynes instructed her to lie to the authorities about her son's death. Haynes told her to "cover for him" because, if charged, he would receive life imprisonment given his prior criminal record. Haynes also

---

[3]These punishments began shortly after one Paul Haynes moved in with Conaghan.

[4]The motion judge was not the trial judge. The trial judge had retired prior to the filing of the motion for a new trial. The motion judge thus did not see Conaghan at the time of the plea. Cf. *Commonwealth* v. *Robbins*, 431 Mass. 442, 447 (2000).

instructed Conaghan to kill herself. When she refused, Haynes instructed her to turn herself in to the authorities; Conaghan did so. In addition, Haynes continued to instruct her on what to tell her lawyer and the authorities. According to Conaghan, Haynes also told her to plead guilty in order to avoid further investigation which might result in his being charged.

(c) *Conaghan's psychiatric records.* Conaghan submitted some of her mental treatment records since her incarceration. She has received extensive therapy for severe bipolar disorder. These records also make references to her "past tendencies to be lorded over by abusive males." Conaghan has not been evaluated for battered woman syndrome while at the Massachusetts Correctional Institution at Framingham, because diagnosis of and treatment for battered woman syndrome is beyond the mandate of the prison's medical services department.

(d) *Evidence at Paul Haynes's trial.* One year and eleven months after Conaghan's plea, Haynes was convicted by a jury of forcible rape of a child, indecent assault and battery on a child under fourteen years of age, assault and battery, and assault and battery by means of a dangerous weapon in connection with his abuse of James and Joyce Sanford.[5] The partial transcript of that trial submitted by Conaghan in support of her motion to withdraw her guilty plea and for a new trial reveals the violent and abusive personality of Paul Haynes.

Haynes moved in with Rebekah Sanford. He brought Conaghan with him and told Sanford that Conaghan was his sister. The testimony reveals that the Sanford children, especially James, were continually "disciplined" by Haynes. The testimony revealed the Sanfords' fear of Haynes and fear of being killed. Conaghan's affidavit expressed the same fear.

Conaghan testified at Haynes's trial. She said Haynes would beat the Sanford children and afterward show her the bruises to humiliate the children. According to Conaghan, Haynes was particularly violent toward James.

Haynes also would talk to Conaghan about Tony who was involved in the mafia and was "very mean and . . . when he wanted something, he got it and didn't care how he got it." Conaghan also said that Haynes had a gun in his briefcase and that he would carry his briefcase with him "all the time." After Conaghan and Haynes separated in May, 1992, they continued

---

[5]These are the same fictitious names used in the Appeals Court opinion.

to exchange letters until sometime in October, 1992,[6] after Conaghan's plea to manslaughter. At Haynes's trial, Conaghan stated that she "still loved him in a sense because of what we shared but that he was now in her past."

(e) *Investigative reports from the district attorney's office.* The district attorney's office interviewed friends of Rebekah and various other women involved with Haynes prior to his trial. These reports reveal Paul Haynes as a violent and abusive person, especially toward women and children.

3. *Delay.* The Commonwealth asserts that Conaghan's delay makes her claim not credible. The Commonwealth also asserts that Conaghan is not credible because she did not come forward until after Haynes's trial.[7] Where, as here, the claim is that Conaghan was not competent rationally to assist her counsel in her defense or to meet the constitutional requirement that a plea must be voluntary with "sufficient *present* ability to consult with [her] lawyer with a reasonable degree of rational understanding and whether [she] has a rational as well as factual understanding of the proceedings against [her]," *Dusky* v. *United States,* 362 U.S. 402 (1960); *Commonwealth* v. *Robbins,* 431 Mass. 442, 445 (2000), expert testimony is required. See *Commonwealth* v. *Crawford,* 429 Mass. 60, 64-65 (1999).

Evidence of battered woman syndrome is "material to the issue whether [Conaghan] could assist her counsel in preparing a defense that served her best interests." *McMaugh* v. *State,* 612 A.2d 725, 732 (R.I. 1992). A common characteristic of battered women is a learned helplessness which manifests itself in the inability to perceive herself as abused and to communicate the abuse to others. *Commonwealth* v. *Pike,* 431 Mass. 212, 222 (2000). Evidence of battered woman syndrome may be considered newly discovered evidence warranting a new trial because usually there is delay in coming forward with information on the abuse, even if there were some knowledge of the abuse at trial. *Id.* See *United States* v. *Brown,* 891 F. Supp. 1501, 1509-1510 (D. Kan. 1995) (granting new trial because there was no way trial counsel would have discovered defendant suffered from battered woman syndrome because victims usu-

---

[6]Conaghan turned herself in to the police on or about May 6, 1992. Conaghan pleaded guilty in September, 1992, and the letters stopped in October, 1992.

[7]We note that Conaghan did not come forward until two years and eight months after Haynes's trial.

ally do not come forward with information on abuse); *Mc-Maugh* v. *State, supra* (noting that it was not until after defendant began serving her sentence that she was able to reveal she was victim of extreme abuse and domination). Therefore, the fact that Conaghan was not able to come forward with claims of abuse at the hands of Haynes until 1997 does not render her allegations less credible, if she suffered from battered woman syndrome.

4. *Conclusion.* Conaghan's motion raises a serious question as to her mental competency to assist her attorney in establishing a defense and to plead guilty voluntarily. On this record, Conaghan is entitled to an examination or examinations by an expert in battered woman syndrome under G. L. c. 123, § 15 (*a*), as to her competency to assist counsel in her defense and to enter a voluntary plea due to battered woman syndrome. G. L. c. 123, § 15 (*a*), provides that "*[w]henever* a court of competent jurisdiction doubts whether a defendant in a criminal case is competent to stand trial or is criminally responsible by reason of mental illness or mental defect, it may *at any stage of the proceedings . . .* order an examination of such defendant to be conducted by one or more qualified . . . psychologists . . . when an examination is ordered, the court shall instruct the examining physician or psychologist in the law for determining mental competence to stand trial and criminal responsibility" (emphasis added).[8] Nothing in the statute limits the time within which this must be done. The Legislature clearly made a G. L. c. 123, § 15 (*a*), examination available at any stage of the proceedings. A statute is to be interpreted according to the plain and ordinary meaning of its words. *Commonwealth* v. *Colon-Cruz*, 393 Mass. 150, 167 (1984); *Rambert* v. *Commonwealth*, 389 Mass. 771, 773 (1983). Because the language of G. L. c. 123, § 15 (*a*), is clear, we give effect to its plain and ordinary meaning and need not look beyond the words of the statute. As we have previously stated, "none of the words of a statute is to be disregarded as superfluous." *Milton* v. *Metropolitan Dist. Comm'n*, 342 Mass. 222, 225 (1961), quoting *Bolster* v. *Commissioner of Corps. & Taxation*, 319 Mass. 81, 84-85 (1946). The dissent fails to give the plain and ordinary meaning to the words of the statute. *Post* at 112-115.

---

[8]We reject the Commonwealth's argument that G. L. c. 123, § 15 (*a*), only goes to mental defect or illness. The words of the statute clearly include mental competency.

The order denying Conaghan's motion for a court-appointed expert under G. L. c. 123, § 15 (*a*), is vacated, the case is remanded to the Superior Court for an examination or examinations by an expert on battered woman syndrome to determine (1) whether Conaghan was suffering from battered woman syndrome; (2) whether, if she were suffering from battered woman syndrome, Conaghan had the ability at the time of that plea to assist her attorney in preparing her defense; (3) whether, if she were suffering from battered woman syndrome, Conaghan was competent voluntarily to plead guilty; and (4) whether, if she were suffering from battered woman syndrome, Conaghan pleaded "with a reasonable degree of rational understanding" and with a "rational as well as factual understanding of the proceedings against [her]." *Dusky* v. *United States, supra* at 402. *Commonwealth* v. *Robbins, supra* at 445. See *McMaugh* v. *State, supra* at 732.

The order denying the motion for a competency examination or examinations is vacated. The matter is remanded to the Superior Court proceeding consistent with this opinion and for such further proceedings as may be needed after the expert has rendered an opinion.

*So ordered.*

SPINA, J. (concurring, with whom Abrams, J., joins). I would add that the record also reveals that, nine days after Conaghan pleaded guilty, she filed a motion to revise and revoke her sentence. See Mass. R. Crim. P. 29 (a), 378 Mass. 899 (1979). That motion has not been heard. Conaghan's submissions on the motion for a new trial raise a serious question as to the accuracy of the facts on which the sentence was imposed. Conaghan may also move for a hearing on the motion to revise and revoke.

The question of the reasonableness of Conaghan's delay in seeking a hearing on the motion is a matter for a trial judge. See *Commonwealth* v. *Barclay*, 424 Mass. 377, 380 (1997). In *Barclay*, we said that factors beyond the defendant's control are relevant considerations in determining the reasonableness of the defendant's delay between the filing of the motion to revise and revoke and the hearing on the motion. See *id.* at 380-381. Additionally, in *Barclay*, the court stated that the delay must be

considered in light of the circumstances and relevant facts. See *id.*

If Conaghan seeks a hearing on the motion to revise and revoke, I would hold that a trial judge, see *ante* at 107 n.4, may use the new trial submissions and may order, in the judge's discretion, a psychiatric examination to aid in sentencing, pursuant to G. L. c. 123, § 15 (*e*).

SOSMAN, J. (dissenting, with whom Greaney and Ireland, JJ., join.) The majority opinion holds that a competency examination under G. L. c. 123, § 15 (*a*), must be performed in order to decide whether the defendant should be allowed to withdraw the guilty plea she entered back in 1992. In my opinion, the ordering of a § 15 (*a*) examination at this juncture is inappropriate as a matter of law and is, in any event, totally unnecessary to the resolution of the motion to withdraw a guilty plea. The majority opinion has twisted § 15 (*a*) to solve what it perceives as a possible miscarriage of justice when, closely read, the defendant's own factual submissions belie the suggestion that battered woman syndrome would have given her a meritorious defense or that battered woman syndrome made her guilty plea involuntary.

The motion judge below had before him a motion to withdraw a guilty plea, coupled with a motion for funds to conduct a psychiatric examination. The defendant acknowledges that the motion judge was correct in denying the motion for funds. See *Commonwealth* v. *Davis*, 410 Mass. 680, 684-685 (1991) (funds not available to gather evidence in support of a new trial motion). The defendant's motion to withdraw her guilty plea asked for an evidentiary hearing, not a § 15 (*a*) examination. The defendant's forty-two page memorandum submitted in support of that motion nowhere even cites § 15 (*a*). At most, one sentence of that memorandum could be interpreted as an oblique reference to § 15 (*a*): "If this court is not satisfied as to the strength of the defendant's showing [that she suffered from battered woman syndrome], she suggests that an examination by a psychiatrist designated by the court may be appropriate." The motion judge denied the defendant's motion to withdraw her guilty plea without holding an evidentiary hearing and without following the defendant's "suggest[ion]" that a psychiatrist be "designated" to examine the defendant. The majority opinion

now holds that it was reversible error for the motion judge to "deny[] the motion for a competency examination."

The proposed use of § 15 (*a*) as a mechanism by which to obtain expert opinion to support a motion for new trial or motion to withdraw a guilty plea is certainly a novel use of that section. Nothing in the statute suggests that a § 15 (*a*) examination into a defendant's competence is to be used for any purpose other than an assessment whether a defendant before the court is *presently* competent to stand trial. The defendant makes no claim of present incompetence, and she is not about to stand trial on any charge. Rather, she claims that she was incompetent back in 1992 at the time of her guilty plea, and she now seeks a § 15 (*a*) evaluation to bolster her motion for postconviction relief. To justify this retrospective use of § 15 (*a*), the majority opinion relies on the provision that a judge may order such an examination "at any stage of the proceedings after the return of an indictment or the issuance of a criminal complaint." § 15 (*a*). However, what § 15 (*a*) provides is consistently described as an examination to determine whether the defendant "is" competent to stand trial, and all of the procedures surrounding competency evaluations and hearings make clear, in context, that such evaluations under § 15 (*a*) are to be performed prior to any trial.

For example, a judge may order an evaluation whenever he or she "doubts whether a defendant in a criminal case *is* competent to stand trial" (emphasis added). § 15 (*a*). Following the evaluation, if "the court is satisfied that the defendant *is* competent to stand trial, *the case shall continue* according to the usual course of criminal proceedings" (emphasis added). G. L. c. 123, § 15 (*d*). If the court is not satisfied as to the defendant's competence based on the evaluation reports alone, the court shall hold a hearing "on whether the defendant *is* competent to stand trial" (emphasis added). *Id.* The section notes that "at any time *before trial* any party to the case may request a hearing on whether the defendant *is* competent to stand trial" (emphasis added). *Id.* If the defendant is found incompetent, "trial of the case shall be stayed until such time as the defendant becomes competent to stand trial." *Id.* Under G. L. c. 123, § 17 (*a*), periodic reviews are to be conducted with respect to anyone found incompetent to stand trial and, if the defendant is no longer incompetent, he is to be returned to the court "for trial." In the case of an incompetent defendant

committed under G. L. c. 123, § 16 (*b*), the defendant must be reevaluated for competence as a prerequisite to any further commitment under § 16 (*c*), and "[i]f the person is not found incompetent, the court shall notify the court with jurisdiction of the criminal charges, which court shall thereupon order the defendant returned to its custody for the resumption of criminal proceedings." § 16 (*c*). Finally, if a person is found incompetent to stand trial, § 16 (*f*) provides that the Department of Correction is to compute what would have been the defendant's parole eligibility date "if he had been convicted of the most serious crime with which he was charged in court and sentenced to the maximum sentence he could have received, if so convicted," and the court "shall dismiss the criminal charges against such person" on that date.

Taken together, these provisions concerning evaluations for competence and the consequences of a finding of incompetence all illustrate that what is at issue is a pretrial assessment of the defendant's present competence. The only reference to any evaluation occurring after trial is an evaluation in aid of sentencing: "After a finding of guilty on a criminal charge, and prior to sentencing, the court may order a psychiatric or other clinical examination . . . . The purpose of such observation or examination shall be to aid the court in sentencing." G. L. c. 123, § 15 (*e*). Nothing in the statutory scheme even remotely suggests that these procedures are to be invoked as a means of determining, years after disposition, whether the defendant was competent to have been tried in the first place. Section 15 (*a*) is a means by which a trial judge, faced with a defendant who is displaying signs suggesting present incompetence, may ascertain whether that defendant's trial may or may not proceed. Section 15 (*a*) is not a mechanism for providing defendants with expert testimony to support motions for postconviction relief. That is precisely the use that the majority now makes of § 15 (*a*).

The majority twists § 15 (*a*) to this novel purpose in the apparent belief that the defendant's submissions raise a serious question as to whether abuse by her boy friend, Paul Haynes, gave rise to battered woman syndrome and whether that abuse or that syndrome would have given her a meritorious defense or rendered her guilty plea involuntary. Section 15 (*a*) is then creatively invoked so that the restrictions of *Commonwealth* v. *Davis, supra,* will not stand in the way of remedying this purported injustice. However, a careful review of the defendant's

submissions reveals that the defendant herself does not provide evidence that she suffered *any* abuse at the hands of Paul Haynes prior to her son's death or prior to the time she made her confession to the police, a confession in which she admitted sole responsibility for the beating that led to the child's death.

The defendant met Paul Haynes in May or June, 1991, and began living with him in July of that same year. She was aware that Haynes had a handgun. Haynes also told the defendant that he knew a person named "Tony" who was allegedly affiliated with organized crime and, on occasions when the defendant "displeased" Haynes, Haynes would "mak[e] reference to Tony." The defendant's affidavit does not recite ever seeing "Tony," ever seeing anyone who had had any dealings with "Tony," or ever having any information as to what "Tony" had ostensibly done to anyone or what "Tony" would do to her. Ownership of a handgun and references to "Tony" do not suffice to make out a case of battered woman syndrome.[1]

When Haynes started abusing the defendant's son in September, 1991, and urged the defendant to engage in such child abuse herself, he did so by advising her that it was the only way to cure her son's behavioral problems. Haynes convinced the defendant that he had "consulted a child

---

[1] "Battered woman syndrome has been described as a 'series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.' " *Commonwealth* v. *Pike*, 431 Mass. 212, 221 (2000), quoting *State* v. *Kelly*, 97 N.J. 178, 198 (1984). "Numbed by a dread of imminent aggression, these women are unable to think clearly about the means of escape from this abusive family existence." *Commonwealth* v. *Pike*, *supra*, quoting *People* v. *Torres*, 128 Misc. 2d 129, 132 (N.Y. Sup. Ct. 1985). Battered woman syndrome has also been described as cyclical, with an initial stage of "mostly verbal abuse, with minor physical abuse," followed by "an explosive instance when the woman is physically beaten up," followed by a respite with no abuse, at which time the cycle repeats "with a decrease in the time between the batterings." *Commonwealth* v. *Lazarovich*, 410 Mass. 466, 471 (1991). "[I]n order to be classified as a battered woman, the couple must go through the battering cycle at least twice." *State* v. *Kelly*, *supra*, quoting L. Walker, The Battered Woman at XV (1979). The defendant's affidavit would put her at best at stage one ("verbal abuse"), without even a single incident of "explosive" violence having occurred, let alone any repetition of the battering cycle or lengthy period of abuse. She had only been living with Haynes for two months at the time she began abusing her son. Cf. *McMaugh* v. *State*, 612 A.2d 725, 728, 733 (R.I. 1992) (defendant subjected to "a pattern of violence and abuse" for six years, followed by "a very focused campaign of physical and mental abuse" in the wake of the crime, was unable to assist her counsel).

psychologist" who had recommended such physical forms of punishments, and told her that her own parents' physical punishment of the defendant in her childhood "demonstrated their love for [her]." The defendant does not mention any threats, abuse, references to or displays of Haynes's handgun, or references to "Tony," in connection with this recommendation that physical punishment would be beneficial to her son, nor does she ascribe her participation in the abuse to any such forms of threats or coercion. Rather, in her own words, she simply accepted Haynes's advice: "Because I desperately wanted to raise [my son] properly and I believed that Haynes spoke truthfully, I accepted Haynes' suggestion that I physically punish [my son]."

The defendant's affidavit then chronicles specific instances of child abuse in which she participated at Haynes's instruction. Nowhere does she state or even suggest that Haynes abused her, threatened her, or that he invoked the name of "Tony," in obtaining her participation in this ongoing physical abuse of her son.

On the day of the beating from which the child died, the defendant merely recites that she participated "[a]t the direction of Haynes." Again, there is no reference to Haynes's physically abusing the defendant herself at any time prior to this incident, nor any reference to Haynes threatening her with abuse (or with "Tony") in order to obtain her compliance with his "direction" to take part in the fatal beating.

When interviewed by the police on the day of her son's death, the defendant claimed that the child had been injured when he slipped on a wet floor and hit his head. The police questioned the defendant again five days later, at which time she confessed to having pushed her son as "punishment." She admitted that she had pushed him to the floor and that, each time he got up, she had pushed him down again. On his final fall to the floor, he had "a seizure." She also admitted to prior instances of physical punishment inflicted on the child. She did not inculpate Haynes in either the beating that led to the child's death or in any of the earlier incidents of child abuse. As of the date of her confession, October 17, 1991, there is no indication in any of the materials submitted that Haynes had subjected the defendant

herself to even a single instance of any form of physical abuse.[2] The affidavit merely recites that Haynes "instructed" the defendant "to lie to the authorities." It does not recite any form of abuse, threat, or ostensible coercion that accompanied that "instruct[ion]." Mere knowledge that Haynes had a handgun, and belief that Haynes could summon "Tony" to assist him in some unspecified fashion, do not amount to battered woman syndrome or coercion, especially when neither "Tony" nor the availability of the handgun was even mentioned by Haynes in connection with the defendant's participation in her son's beating or the defendant's confession to the police.

The defendant and Haynes subsequently went to live with Rebekah Sanford. According to the testimony in Haynes's later trial, the move to the Sanford household occurred sometime in February, 1992, four months after the defendant's son had died and four months after the defendant's confession to the police. The defendant's affidavit describes the physical abuse that Haynes perpetrated on the Sanford children. The defendant then provides the sole allegation set forth in her entire materials concerning any physical abuse she herself suffered at the hands of Haynes: "While at Sanford's home, Haynes became physically abusive to me and struck me." She does not say when during their stay at the Sanford home this began, how many times or how often any such abuse occurred, or provide any further information whatsoever concerning this alleged abuse by Haynes.[3] The defendant was taken into custody on May 6, 1992, and remained in jail thereafter. Thus, whatever this unspecified abuse consisted of, its maximum time span was from sometime in February (when the defendant and Haynes moved in with Sanford) up until May 6 of the same year, a period of at most three months.

While one could have considerable sympathy for a defendant who put forth a compelling array of facts and details of abuse but who was unable, due to lack of funds, to provide an expert opinion that those facts did indeed make out a case of battered woman syndrome, this defendant has put forth only that single

[2]By that time, the defendant had been living with Haynes for only three months. Again, three months of references to "Tony" will not suffice to make out a case of battered woman syndrome. See note 1, *supra*.

[3]By comparison, the defendant's affidavit is highly detailed and specific in recounting the various forms of severe physical abuse that Haynes inflicted on the defendant's son and the Sanford children.

conclusory sentence concerning Haynes's alleged abuse of her and places that abuse at a time period many months past her son's death and many months past her own confession to the police. It does not require an expert to explain to the court that abuse that postdates the events at issue will not provide any explanation, justification, or excuse for the events themselves.[4]

The defendant pleaded guilty on September 1, 1992, after spending approximately four months in jail awaiting trial. Although she was in contact with Haynes during the time she was in jail and she claims that he "instructed" her to plead guilty, she does not recite or allege any threat on the part of Haynes, or even any veiled references to "Tony," occurring during the months prior to her change of plea. Instead, she describes how Haynes told her that, because of his own prior record, he would be imprisoned for life if he were convicted in connection with the child's death. By that time, of course, the defendant had long since given the police a confession in which she took full blame for her son's death and, even on her current version of events, she would be culpable as a joint venturer with Haynes. Thus, faced with the fact that she would likely (and properly) be found guilty, the only issue was whether she would inculpate Haynes (and send him to prison as well) or whether she would continue with the version in which she took sole responsibility for her son's fatal beating. Haynes "pressured" her to plead guilty by telling her what drastic consequences there would be for him if she ever implicated him in their joint crime. That is apparently all the "pressure" it took, as the affidavit recites no other form of "pressure."

At the defendant's change of plea hearing, the prosecutor recited the contents of the defendant's October 17, 1991, statement to the police. The defendant adopted as true that prior confession. The facts on which her change of plea was based and accepted did not include any additional information or details beyond what was already in her October 17, 1991,

---

[4]The defendant's affidavit recites that she was subjected to physical punishment by her parents and that her former husband had abused her from 1986 until her divorce in 1987. She then had a relationship with another man who allegedly abused her son, but the affidavit does not contain any allegation that that boy friend abused the defendant at all. Her relationship with Haynes commenced in 1991. While abuse by others prior to her relationship with Haynes might well contribute to the defendant's susceptibility to abusive relationships, it does not alter the fact that Haynes did not subject her to any physical abuse until after the relevant time frame.

confession. As such, her change of plea was not based on any new version of the facts that had been created or altered in response to any "pressure" from Haynes. She pleaded guilty (and was sentenced) based on the precise version of events that she had provided to the police within a week of her son's death, a confession that long predated any physical abuse by Haynes.

Notwithstanding the defendant's claimed inability to resist Haynes's "pressure" on her to protect him, the undisputed record then shows that the defendant testified *against* Haynes less than two years later when he was prosecuted for his physical and sexual abuse of the Sanford children. On August 2, 1994, the defendant was called as a witness for the prosecution as part of its case-in-chief against Haynes. The defendant gave direct testimony against Haynes with respect to his severe physical abuse of one of the Sanford children, and gave testimony that corroborated the claim that Haynes had sexually abused Sanford's daughter.[5] Whatever perverse dynamic there had been in the defendant's relationship with Haynes, it was not a dynamic that prevented her from providing the Commonwealth with highly inculpatory evidence against him in a serious child abuse case.[6] Thus, despite the fact that the Massachusetts Correctional Institution at Framingham had neither evaluated, diagnosed, nor treated the defendant for the purported battered woman syndrome that allegedly had led her to plead guilty and protect Haynes back in September, 1992, she was perfectly capable of giving damaging testimony against him in August, 1994.

As the majority opinion of the Appeals Court notes, the defendant then waited until April 29, 1997, more than two and one-half years after testifying against Haynes, before filing her motion to withdraw her guilty plea. Battered woman syndrome could certainly explain a woman's delay in coming forward, but where the defendant was sufficiently free of the effects of her alleged syndrome to be able to testify freely against Haynes in August, 1994, she would have been sufficiently free of it to

---

[5]Haynes was convicted of forcible rape of a child, indecent assault and battery on a child, assault and battery by means of a dangerous weapon (a cigarette lighter), and assault and battery. *Commonwealth* v. *Haynes*, 45 Mass. App. Ct. 192 (1998).

[6]Nothing in the trial transcript suggests any hesitation, reluctance, fear, or unwillingness on the defendant's part with respect to giving this incriminating testimony against Haynes. Indeed, Haynes's counsel attempted to attack the defendant's credibility by suggesting that she was testifying against Haynes out of vengeance because he had "jilted" her.

.

press her own claim that Haynes had been primarily responsible for her son's death. The delay, so long past the date on which she was indisputably capable of speaking out against Haynes, provides further grounds for skepticism of the defendant's current version of events.

In my opinion, the defendant's claim that her plea was involuntary because it was the product of abuse suffered at the hands of Paul Haynes, abuse that allegedly gave rise to battered woman syndrome, is utterly unsupported by the defendant's submissions. As such, her motion to withdraw guilty plea was properly denied without an evidentiary hearing. "Appellate courts generally defer to the sound discretion of the trial judge on whether a motion for a new trial requires an evidentiary hearing or whether it can be decided on the basis of the facts alleged in the affidavits." *Commonwealth* v. *DeVincent*, 421 Mass. 64, 67 (1995), citing *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992), and *Fogarty* v. *Commonwealth*, 406 Mass. 103, 110 (1989). The judge acted well within his discretion when he determined that the defendant's motion did not require any evidentiary hearing, and he certainly did not abuse his discretion in failing to order an evaluation of the defendant under § 15 (*a*).

What is disturbing on this record, and what presumably has given the majority its sense that justice may not have been done, stems not from Haynes's alleged abuse of the defendant (evidence of which is limited to a single conclusory sentence in the defendant's affidavit and in any event postdates the defendant's confession) but from Haynes's horrific abuse of the Sanford children. The record amply demonstrates that Haynes was capable of inflicting horrendous child abuse, and it is quite possible that Haynes was, as the defendant alleges, the principal culprit in the beating death of her son. The fact remains that the defendant permitted Haynes to abuse her son repeatedly, and participated in that abuse herself (based solely on Haynes's advice that such abuse was necessary in order to raise the child "properly"), long before Haynes subjected the defendant herself to any form of physical abuse. The defendant then confessed to this crime within a few days, also long before Haynes had subjected her to any physical abuse. That she took all of the blame herself, out of perversely misguided loyalty to the man who had just killed her son, does not make her plea involuntary. Her desire to cover up for Haynes, which had already surfaced back in her original September, 1991, confession, cannot be at-

tributed to or explained by unspecified incidents of abuse that did not even start to occur until February, 1992, at the earliest.

The motion judge acted within his discretion in denying the defendant's motion to withdraw her plea, and nothing in this record compelled him to send the defendant for an evaluation under § 15 (*a*) before he could deny that motion. I respectfully dissent.